Robert P. SEIBEL and Mary Ellen Seibel, Respondents,

v.

HARRY S. SURKAMP INVESTMENT CO., a Corporation, Appellant.

No. 22969.

Kansas City Court of Appeals.

Missouri.

Oct. 5, 1959.

Robert L. Shirkey, Rogers, Field, Gentry & Jackson, Kansas City, for appellant.

John R. Campbell, Kansas City, for respondents.

MAUGHMER, Commissioner.

Respondents, as plaintiffs, had judgment in the sum of $447 against appellant for money allegedly withheld without authority out of funds received from the sale of plaintiffs' residence property. The case was tried by the court without a jury.

It is appellant's contention on appeal that the Court should have sustained its motion for directed verdict because (1) Plaintiffs, with full knowledge of the facts, ratified the act of their agent in authorizing and approving the withholding here involved, and (2) There was a genuine dispute as to the amount due plaintiffs and plaintiffs compromised by accepting a lesser sum than the amount claimed, which act constituted an accord and satisfaction.

During the summer of 1956, plaintiffs Robert P. and Mary E. Seibel, husband and wife, were owners and occupants of a residence property located at 7423 Harrison Street, Kansas City, Missouri. Mr. Seibel was assistant zone manager for Oldsmobile Division of General Motors Corporation. In August, 1956, he was transferred by his company to Cincinnati, Ohio. Before Mr. Seibel departed for Ohio he and his wife signed an agreement with one R. C. Bell and the R. C. Bell Realty Company, Kansas City, Missouri, authorizing the Bell Company to act as their real estate agent for the sale of this property. The agent located a buyer in the persons of Mr. and Mrs. David D. Dysart. Under date of September 11, 1956, the Seibels and the Dysarts executed a written real estate contract covering the sale. The stated contract sale price was $18,000—$500 paid down, $2,600 cash to be paid on delivery of deed, and FHA loan to be secured for the balance of $14,900. The sales contract contained this specific provision: "This contract is subject to the buyers being able to secure, qualify for and pay the cost of an FHA loan in the amount of $14,900.00 to be used as the balance of the purchase price of the above described Real Estate. The buyers agree to execute all papers necessary in order to secure the above loan."

Mr. Seibel departed for Cincinnati and Mrs. Seibel remained in Kansas City pending completion of the sale. The husband returned to Kansas City early in October, signed the warranty deed and left it with Bell Company, their constituted closing agent.

The Dysarts, as contract purchasers, immediately embarked upon their quest for an FHA loan of $14,900 on this $18,000 property. Apparently they had been dealing with Mr. Albert Barker, the then general manager of the R. C. Bell Realty Company. In any event, Mr. Barker suggested to them that they go to the Harry S. Surkamp Investment Company—the present appellant and defendant below to obtain the desired loan. Mr. and Mrs. Dysart did so and defendant company secured such a loan for them and in the necessary amount. The Dysarts executed all required papers, paid

the Surkamp Company the purchase price balance of $2,600, which with the original $500 down payment, and the $14,900 proceeds from the loan, constituted full payment of the $18,000 purchase price. In addition, the Dysarts paid the Surkamp Company a 1% loan discount. Based upon the evidence of record and particularly upon defendant's "Closing Statement" referred to more fully hereinafter, Surkamp Company paid off the existing loan and released it of record, properly charging sellers with the recorder's fee for releasing, prorated the current year's taxes, paid a $900 commission to Bell, placed the FHA loan of record, paid abstracting fees, bought and affixed the necessary documentary stamps and, having procured Seibels' warranty deed from Bell, delivered it to Dysarts, the buyers, who thereupon became entitled to and did enter into possession.

It was conceded by counsel for both sides in open court during the trial that at the time of this transaction the FHA regulations forbade collecting a service charge in excess of 1% against a borrower. The legal limit was, therefore, levied by Surkamp upon Dysarts, the borrowers. However, the FHA regulations contained no restrictions as to the amount of loan commissions which might be charged to a seller.

Mr. Albert Barker, who sent the Dysarts to Surkamp, testified that he and Mr. R. C. Bell were in plaintiffs' home in April, 1956; that Mr. Seibel was then expecting a transfer to Texas, and that he listed his house for sale at that time. Mr. Barker said he explained to them about the tight money market, the 1% FHA loan limitation and told them that if prospective buyers had to secure an FHA loan it would be necessary for the sellers to also pay a loan commission. Mr. Seibel was not transferred to Texas and there was no sale. Barker said he had a conversation with the Seibels in their home in August, 1956, when the property was listed with Bell for the second time. He stated that he again discussed the "tight money market", told them the commission rate had risen further, would be at

least 2% and might be more. According to Barker their reply was "Let's get the house sold as quick as we can." He had no further discussion with them on this subject prior to consummation of the sale. However, he stated that after he had channeled the Dysarts to the Surkamp Company he was advised by Mr. Thomas, Vice-President of that company, that the discount for the loan would be 3% to be charged to the Seibels, that he told Mr. Thomas such charge would be satisfactory, and to "Go ahead and do it." Mr. Barker was asked if there was ever an agreement by the Seibels for a 3% discount to be charged to them. His answer was "Not as such."

It should here be noted that Bell Realty Company was the only authorized agent of the plaintiffs as to any part of the sale transaction. There had been no discussion whatever between any representative of the defendant company and the Seibels prior to consummation of the sale. Mr. E. L. Thomas, of the defendant Surkamp Company, testified that he did not know the Seibels, did not even know they were in Cincinnati, and that he had no discussion or contact with them. He said he talked with Barker, advised him of the 3% commission, and that Barker said "Proceed with the loan." The Surkamp Company, after completion of the loan and receipt of the proceeds, by letter dated October 11, 1956, sent its check and closing statement to the Seibels in Cincinnati. Payment of the Seibels' loan on the property, together with undisputed closing costs, left a balance of $6,957.90. From this sum Surkamp deducted $447 (3% on the $14,900 loan) and sent Seibels a check for $6,510.90. This $447 is the subject of the lawsuit. In the closing statement accompanying the check, this item is described as "service charge on loan."

The plaintiffs testified by depositions. They described an exclusive listing of the property for sale with Bell Realty, the receipt of Dysarts' offer to buy for $18,000, their acceptance of the offer, execution of warranty deed, and receipt of Surkamp's

closing statement with check for $6,510.90. It was their testimony that until receipt of such statement and check they did not know that the Surkamp Company was involved in the transaction, that they had never been advised of any loan commission to be paid by them, nor had they agreed to pay any such service charge. Mr. Seibel said he immediately telephoned his representative Mr. Bell, who told him he would check with Surkamp and advise him further. Seibel said he thereafter received an explanatory letter from Surkamp. This letter was dated October 16, 1956, and signed E. L. Thomas, Vice-President. It referred to the "tight money and higher interest rates" on FHA loans and suggested that Seibel contact the real estate board in Cincinnati concerning the matter of discounts. The letter concluded with this statement: "The discount was discussed with you by the R. C. Bell Realty Company and perhaps these details will more clearly inform you as to just what it is." The letter did not assert or mention that the Bell Company, Seibels' sales agent, or any one for them, including Mr. Barker, had authorized this 3% commission charge, nor had Mr. Bell, in his telephone conversation with Seibel, even intimated that either he or one of his representatives had authorized it. There was enclosed with the closing statement and check a statement for Seibels to sign, which recited approval of the whole transaction in detail. The Seibels did not sign and return such statement, but they did deposit the check. The record does not show the exact date on which they deposited or cashed the check for $6,510.90. The endorsements only reveal that it was paid at the Kansas City Clearing House on October 23, 1956.

No settlement of the controversy was reached and on February 26, 1957, the Seibels filed suit to recover the $447. The suit was instituted in the Magistrate Court of Jackson County, Missouri, with the Surkamp Company and the Dysarts as named defendants. Upon arrival by appeal in the Circuit Court the action was dismissed as to the Dysarts, but prosecuted to final judgment against the Harry S. Surkamp Investment Company, a corporation.

■ As previously stated, this case was tried by the court without a jury. There were no findings of fact or conclusions of law. Therefore we shall review the case upon both the law and the evidence as in suits of an equitable nature and reach our own conclusions but giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. Section 510.310, subd. 4, V.A.M.S.; In re Petersen's Estate, Mo., 295 S.W.2d 144; Smith v. Smith, Mo.App., 313 S.W.2d 753, 754.

Certainly plaintiffs would not be chargeable with this fee or commission on their residence purchaser's loan unless they either authorized it or consented to it or afterwards accepted and approved of it. There is no evidence or contention that they directly authorized Surkamp to assess such charge against them. Defendant tacitly, at least, concedes as much by presenting only two assignments of error and suggesting only four theories upon which plaintiffs can be charged and held, namely, (1) That they agreed with their agent Barker in advance to assume and pay such fee; (2) Their agent Bell Realty Company and its general manager, Barker, had authority to and did so bind them; (3) By cashing the Surkamp check, with knowledge the service charge was withheld, they ratified the act of their agent Barker in authorizing such charge, and (4) By cashing defendant's check with such fee withheld they compromised a disputed claim, reached an accord and satisfaction, and are thereby precluded from recovery.

As to No. 1, Mr. Barker says he early told plaintiffs about such a charge and they told him to go ahead and sell the house. Mr. and Mrs. Seibel denied this. It is true that on this disputed fact issue the trial court did not see and hear the plaintiffs testify—rather it read their depositions as we have done. However, Mr. Barker appeared in person and the court quite apparently accepted the plaintiffs' version as

to this point. We see no reason to and shall not overturn such finding.

We do not believe that Barker was clothed with authority to bind Seibels to pay the 3% commission, and that Surkamp was justified in assuming he had such authority. The principal business of the Bell Realty Company was selling real estate. Its authority to act as Seibels' agent was based on a written exclusive sale listing of the Harrison Street property. Surkamp knew these things, knew about their sales contract with Dysarts, knew about and paid the $900 sales commission. As stated in 2 C.J.S. Agency § 93, p. 1193: "* * * where one person claims to be dealing as agent for another in a transaction with a third person the latter is bound to investigate and assure himself that an agency exists and it is at his peril that he omits to do so. The duty of inquiry requires more than the ascertainment of the mere existence of authority, however, the third person having the obligation to proceed further and inform himself as to its character and extent." And as further stated § 23 at page 1046: "An agency will not be inferred because a third person assumed that it existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such as to make such an agency seem natural and probable * * *."

The Springfield Court of Appeals in Wyler Watch Agency, Inc. v. Hooker, Mo.App., 280 S.W.2d 849, 854, declared the rule as follows: "It is settled that one, who deals with a known agent, is charged with the duty of ascertaining for himself the scope of the agent's authority * * *. '(T)he party who claims reliance (on an agent's apparent authority) must not have closed his eyes to warning or inconsistent circumstances. Authority is not "apparent" simply because the party claiming has acted upon his conclusions. * * *. It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions * * * brought to his notice, would reasonably rely, that a case is presented within the operation of the rule.' (citing cases)."

We find the following statement in Mechem on Agency (2d Ed.) Vol. 1, page 513: "Authority is not 'apparent' simply because the party claiming has acted upon his conclusions. It is not 'apparent', in contemplation of law, simply because it looked so to him. It is not a situation where one may read while he runs. It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions which are brought to his notice, would reasonably rely, that a case is presented within the operation of the rule. If the inferences against the existence of the authority are just as reasonable as those in favor of it, there can be no reliance within this rule." We rule that Barker was without authority to bind plaintiffs for payment of this commission and that defendant was not justified in assuming he had such authority.

Strictly speaking, a true accord and satisfaction consists of the two elements expressed in that phrase. Accord is the agreement whereby one party agrees to give or perform, and the other to accept, in satisfaction of a claim arising from contract or tort, something other than or different from what he is or thinks himself entitled to. Satisfaction is the performance of such agreement. 1 C.J.S. Accord and Satisfaction § 1, p. 462. This phrase is often used interchangeably with compromise and settlement. However, an accord unexecuted is not a bar, whereas a valid compromise, although executory, is a bar. The general rule is that payment of a sum admittedly due and payable furnishes no consideration for the discharge of an additional and distinct item of liability and does not effect an accord and satisfaction.

In 1 C.J.S. Accord and Satisfaction § 29, pp. 502–503, we find this statement: "The payment by a debtor, and acceptance by the creditor, of a sum which is conceded by the debtor to be due and payable, or as to which there is no dispute or controversy, furnishes no consideration for the discharge of a disputed claim for an additional and distinct amount or item of liability, for the payment, being of nothing more than the debtor admittedly owes, is neither a detriment to him nor a benefit to the creditor, and so does not constitute or effect an accord and satisfaction thereof, or of the entire account between the parties, in the absence of any new or additional consideration, * * * even though such payment is tendered and accepted * * * or receipted for * * * as in full payment or settlement. The payment operates as a discharge of the items or amount paid only, and the creditor is entitled to maintain an action to recover the balance of his claim."

Our Missouri decisions are in accord with these stated legal conclusions. In Roland v. Gassman, Mo.App., 44 S.W.2d 658, 660, the Springfield Court of Appeals said: "This court has had occasion to review the authorities on the question here raised in two comparatively recent cases, wherein we held that, in a suit on an account, a check for an amount conceded to be due and tendered as payment in full does not constitute an accord and satisfaction of a disputed portion of the claim because under such circumstances there is no consideration to support the accord. Vaughn v. Conran (Mo.App.) 4 S.W.(2d) 495; Whitmire v. [Lawrence, Barry and Stone Counties Mut.] Benefit Ass'n (Mo.App.) 286 S.W. 842, and cases cited."

The same court in Harlin & Griffin v. Mo. State Highway Com., Mo.App., 51 S.W.2d 553, 555, phrased it this way: "This assertion is based upon the theory that an accord and satisfaction does not result where a party pays an amount admitted to be due, or a liquidated amount, to which he has no defense, for the reason that in such case there is no consideration to support the release. The authorities cited, from Swaggard v. Hancock, 25 Mo. App. [596] 606, to Vaughn v. Conran (Mo. App.) 4 S.W.(2d) 495, uphold the general proposition of law above stated." It is evident that the $6,510.90 check paid an amount of money admittedly due and concerning which there was no dispute. We hold, therefore, that its acceptance by plaintiffs did not constitute an accord and satisfaction as to the $447 item, no part of which was paid.

Having now determined that in our case plaintiffs neither specifically nor impliedly clothed their agent with authority to bind them to pay the loan commission and that their cashing of Surkamp's check did not result in an accord and satisfaction, we now consider appellant's final point; that is, did plaintiffs ratify the act of their agent Barker in this respect?

Ratification is the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another without authority. In substance it is the idea of confirmation after conduct. 2 C.J.S. Agency § 34, pp. 1068, 1069, 1070. Clearly there is no express ratification here, there being no contention that the plaintiffs, in express terms, ratified the act nor is there any writing or statement showing such intention. 2 C.J.S. Agency § 46, p. 1090. Appellant bottoms its assertion of ratification upon the fact that plaintiffs cashed the check for $6,510.90, knowing the 3% commission had been deducted, and appellant says they did this " * * * with full knowledge of all the material facts." We quote from 2 C.J.S. Agency § 49, p. 1097: " * * * it is well settled that, as a general rule, if a principal with full knowledge of all the material facts takes and retains the benefits of the unauthorized act of an agent he thereby ratifies such act, with the liabilities and burdens resulting therefrom."

Did the plaintiffs at the time they cashed the check have "full knowledge of all the material facts"? Did plaintiffs at the time they cashed the check know that Mr. Barker, general manager for their sales agent Bell Realty Company, had, purporting to act for them, agreed for them to pay the 3% commission? Mechem on Agency, 2d Ed., Vol. 1, Par. 479, p. 352, says: "Ratification is not a matter to be presumed; it must be proved. And the burden of proof rests upon him who alleges it."

The evidence is that plaintiffs first learned that the Surkamp Company was involved when they received its letter dated October 11, 1956, and presumably received about October 13. Mr. Seibel then called Mr. Bell, who told him that he would "check with Surkamp" and advise him further. The next communication was Surkamp's letter dated October 16, 1956, probably received in due course about the 18th. This letter did not advise plaintiffs that Surkamp had made the charge pursuant to authorization from Bell or from Barker, or that either had authorized such charge. Then there was a letter dated October 22, 1956, from R. C. Bell, president of the Bell Realty Company. Among others it contained these statements: "Neither my company nor I received one penny of the $447. The mortgage company collected this amount out of money due you and passed it on, in its entirety, to the permanent investor so that you, the seller of the property, could cash out * * *. They (Surkamp) collected it from you without authority." The Surkamp check was paid by the Kansas City Clearing House on October 23, 1956. It must have been cashed in Cincinnati a few days before. From this evidence we must and do conclude that when plaintiffs cashed the check they neither knew, nor had it been suggested to them, that Surkamp had withheld the $447 because Barker, purporting to act as their agent, had authorized it.

Our Supreme Court en banc in Scrivner v. Amerian Car & Foundry Co., 330 Mo. 408, 50 S.W.2d 1001, 1010, said: "Knowledge by the principal of the unauthorized act done or agreement made by the agent is essential to ratification of such act or agreement. * * * For, as to the matter in question, the person acting is not an agent until ratification, and it cannot be said that the principal has ratified with knowledge at the time of ratification simply because the person who thus becomes agent has knowledge." This last case was approved in State ex rel. Mutual Life Ins. Co. of Baltimore v. Shain, 339 Mo. 621, 98 S.W. 2d 690, 692, 693, the court saying: "In Scrivner v. American Car & Foundry Co., 330 Mo. 408, 50 S.W.(2d) 1001, 1010, this court, citing many cases, stated elemental principles of ratification, as follows: 'Knowledge by the principal of the unauthorized act done or agreement made by the agent is essential to ratification of such act or agreement. * * * There can be no ratification by a principal of an unauthorized contract of an agent, unless the principal has knowledge of the terms and material facts of the contract. This is the settled law in Missouri and in all other jurisdictions.' * * * *What was there to show either directly or by inference that the company knew that their agent had made such an oral agreement or waiver or that plaintiffs so claimed? * * *.* It will be noted that the Court of Appeals did not find that the company was ever, prior to the trial, given any information or had any knowledge of the statements plaintiffs claimed that its agent Sedoris made to them." (Italics added.)

We hold there was no ratification. The views already expressed herein are decisive as to this appeal. It is unnecessary, therefore, to either discuss further or press to final conclusions the other kindred legal elements of ratification present in this case, namely, lack of consideration and absence of benefits flowing to plaintiffs.

Any contention that plaintiffs must have offered to rescind the whole real estate deal with the Dysarts is without merit.

The Dysarts had completed their part of the contract and paid the full purchase price. As buyers they had received the plaintiffs' warranty deed and recorded it, had placed a loan of their making on the property and entered into possession. The Surkamp Company not only knew all this but had at least collaborated in bringing it about. Inasmuch as Surkamp had paid off and released plaintiffs' loan, had recorded and delivered plaintiffs' warranty deed to Dysarts, had placed its own or its investors' loan on the property and thereby vested right to possession in the Dysarts, and since the Dysarts had complied fully with their purchase agreement, plaintiffs' property was gone beyond recall. Any offer to rescind would be ineffective, could not result in forcing Dysarts to either cancel their completed loan or surrender their title, and the Surkamp Company is in no position to require such an offer to rescind.

Appellant has cited a number of cases. It would accomplish no worthwhile purpose to analyze each of them. All declare general rules of agency and are in accord with the authorities cited herein—in fact we have referred to some of the same cases. However, the facts here are not covered by the canopy of those court rulings and textbook declarations.

No other assignments of error having been presented, the judgment is affirmed.

SPERRY, C., concurs.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court. All concur.