**J. H. CURD, d/b/a J. H. Curd Real Estate, Appellant,**

v.

**Joseph H. CANTRELL and Betty R. Cantrell, Respondents.**

**No. WD 30731.**

Missouri Court of Appeals,
Western District.

March 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 7, 1980.

Application to Transfer Denied
May 13, 1980.

W. Raleigh Gough, Independence, for appellant.

Sylvester Powell, Jr., Kansas City, Heilbron & Powell, Kansas City, of counsel, for respondents.

PRITCHARD, Judge.

In appellant's claim for a real estate sale commission, the issue is whether there was evidence that the claim was disputed so that an instruction upon accord and satisfaction was properly given to the jury.

The property involved is located on U.S. Highway 71 in the western portion of Harrisonville, Missouri, and is known as the Mobile Hydraulic Building. Appellant sold

the property for one Walker to respondents in 1968. In 1972, the building was vacant, and had been vandalized. Joe Cantrell was then working for Pappas Chevrolet in Kansas City, and asked appellant to sell his Harrisonville house (which was done) so he could move closer to work. About that time Joe asked appellant what the building was worth, they went out and looked at it, and appellant told Joe if he could wait for someone who had a use for it, he could get $250,000, and Joe told him if he could get that amount he would sell it. Appellant added $25,000 for a commission on top of that and started pricing the property. Nothing was then said about leasing it. Appellant did not secure a purchaser who was willing to pay the price.

In April, 1973, Warren Davis, the ultimate purchaser of the property (under a lease option), called appellant and wanted to look at the building, and Davis was shown the building. Davis had seen appellant's realtor sign on a 4.3 acre portion of the property (which Joe had for sale) and called appellant about it rather than Joe. Later, according to appellant, Davis told him he could not afford to buy, and appellant started negotiating it, informing Joe of his actions. Two or three weeks later appellant met with Joe, Davis, Presley Wright (Davis' partner), and another man (attorney Don Slyter) at the building. The contract between respondents and Davis was worked out by their attorneys, and appellant told Davis' attorney, Slyter, to put his name on the contract, but he was dumbfounded when he found out this was not done. Appellant never asked Joe to put his name on the contract, and there was never a written listing of the property for sale between them. After this meeting, appellant testified that he talked with Joe and his attorney, Mr. Powell, and was asked how much he wanted on the lease. Appellant said, "Whatever is customary." Powell asked him if he would take 6% of the lease rentals *and* 6% on the sale if it were later finalized.

According to appellant, Davis contacted him in the fall of 1973 about exercising the option to purchase, and appellant helped him with financing and conveying messages between Davis and Joe. Appellant talked with Joe a week or ten days before the option was exercised and Joe offered at that time to give him $5,000 or $6,000. Joe paid the 6% commission on the lease payments up to April, 1974, and being pinched, it was agreed that appellant "would let him slide for awhile," and receive 10% interest. The sale to Davis was finalized July 15, 1976, appellant not being present at the closing. About ten days before the closing, appellant met Joe at Pappas Chevrolet and presented him with a statement of what he claimed to be due him: $2,340 for lease commissions; $253.25 interest thereon (totalling $2,593.25); and $16,500 for commission at 6% on $275,000 sale of the property, all totalling $19,093.25. Joe told him, " 'I've got it closed, and I'm not going to pay anything.' " Joe made out a check to appellant, dated August 14, 1976, for $2,372.75, with a memo on its face "Lease Commissions", and a notation on the reverse, "Payment in full on Commission on Lease with Mobile Hydraulic Corp. 2603.25 Comm.— 230.50 less repair to Pappas Chev., 2,372.75." Appellant's wife picked up this check from Joe and appellant endorsed it. No further contact was made between the parties until this action was filed.

Joe's version of the relations with appellant was this: He denied the initial tour of the building with him or discussing any terms of sale as testified to by appellant. His witness, real estate agent McCreary, and a close friend, testified that it was he who advised Joe to sell the building for $275,000 to $300,000. Joe did talk with appellant, but only about 4.3 of the total 9.8 acres, the smaller part having been for sale since 1972. Joe, Davis and an Orval Jackson testified that it was Jackson who referred Davis to the building. Davis had gone to the property, had seen appellant's sign on the 4.3 acres, so he called appellant instead of Joe. Joe and Davis testified that a lease, and no sale, was all that was discussed the first time they met with appellant at the building. It was only later that Davis contacted Joe about buying the property and then asked that the purchase op-

tion be added. Joe told Davis that appellant was trying to "horn in" on the deal and that he would want cash if appellant was going to try to get a commission. After Joe and Davis had agreed upon buying the property by way of option, they agreed to meet in the law offices of Don Slyter, Davis' lawyer. Mr. Powell, Joe and appellant went to the office, and Powell mentioned to Joe that he had "better get squared away on what you are going to pay Jim." "Q Did we talk about it in the office there that day? A All right. We got _ _ Yes. Q All right. Do you remember how it came about? A Sure do. We got there a little prior to Warren Davis and Presley Wright, and uh, you turned to Jim Curd to ask him what he wanted out of this agreement. Uh, Jim said, 'I expect the customary', and you asked him again, 'well, what is customary?' Q Had there been any talk whatever, before that day down in the office, about how much he was going to charge, or how much you were going to pay? A Never had been discussed. Q All right. And when I asked him what was customary, what did he say? A He said, 'six percent on the lease, and I ought to have a fee on the option if it's exercised.' Q All right. Did I then turn to you? A Yes, you did. Q Did you and Jim Curd then discuss it? A We did. Q And what was said about the option? A Okay. The first response was that was 'too damn much. I'll agree to the six percent on the lease, but nothing on the option.' Q Did you mention to him that day, that the prospect came from Orval Jackson, and not from him? A I said, 'the lease option was an afterthought. It was presented to us from Orval Jackson, and for that matter, it isn't necessary to put the lease together. It's something I can omit if it's going to become a big problem for us.' Q You told him we would just delete the option from the contract _ _ A Yes. Q _ _ if it was going to become a fee problem? Did he agree to the six percent? A He mumbled, then finally agreed to it."

According to Joe as to certain letters written by Davis to appellant (wherein Davis stated that the initial contact and ensuing agreement pertaining to the building and land was a result of appellant's contact with Wright and Davis; Davis' desire to lease the land with a subsequent right to purchase was communicated to appellant; appellant did attend the last meeting concerning the details of the agreement, there being no changes at the time of signing; appellant gave his business card to Slyter and indicated he was agent for Joe), the facts stated were not in existence until after the letters had supposedly been written. When appellant contacted Joe, Joe told him that if he were involved in the sale, there would be no sale, that he would not close the deal, and that he was sticking to the original agreement.

Appellant pleaded in three counts an oral agreement to sell the property for $250.000, with any amount over that to be received as a commission, so he was entitled to $25,000; that at the time the lease was signed he and Joe agreed that appellant was to receive 6% of monthly rentals and 6% of the sale price if the option to purchase was exercised, so he was entitled to $16,500, or a reasonable commission on the sale was 10%, so he was entitled to $27,500. Joe filed answer to each count, denying appellant's claim and set up the defense of accord and satisfaction with appellant on August 14, 1976. For reply to each count, appellant pleaded a lack of consideration for any purported accord and satisfaction.

Instruction No. 5, here attacked by appellant, is:

"Your verdict must be for defendants if you believe:

First, there was a bona fide dispute as to the sum of money due and owing plaintiff, and

Second, defendants paid the plaintiff the sum of $2,372.75 by check in full payment of all sums due and owing, and

Third, plaintiff accepted said check in full payment of all sums due and owing."

Appellant argues that the "payment in full" was for the lease part but not for the sale of the property also. Contrarily, Joe's position is that the payment was compensation for both the lease and the option. In addition to his testimony above, he further testified on cross-examination: "Q Just so I

understand for sure, that when you were at Slyter's office and you told Curd you would give him six percent of the lease, that's what you were talking about, was the payments that Mobile Hydraulic was making to you for the right to possess that building for three years? A We made that very clear. Q That was the agreement? A Yes, sir. Q Okay. So your language then, on the reverse side of this check, Defendants' Exhibit No. 1, that says, 'payment in full on commission on lease with Mobile Hydraulic Corporation', that's exactly what that is, is the payment in full of the six percent of the monthly payments, isn't it? A That's the lease agreement, right. Q And exactly what this represents is just payment on the lease agreement? A Correct. Q Okay. Now, it had been in arrears for some time, hadn't it? A Yes. Q Okay. So, it was reasonable to assume that Jim Curd would want to give you a signed receipt, which is what this would be, for those payments, isn't it? A Satisfaction in full for the contract. Q No, no, no. Satisfaction in full for the lease payments. I want to keep you straight on that. Right? A This was in satisfaction in full for the lease __ Q The lease payments, and that's all. A The option __ MR. POWELL: You are stopping him, Tom; that's not proper. Go ahead and answer the question. THE WITNESS: This was total compensation, as we had agreed back at Don Slyter's office, for the obtaining of the lease and the option, whether it was exercised or not. Q (BY MR. CAMPBELL) No sir. Now, that's not what you said, was it? You said the only thing you ever agreed to pay him was six percent on the lease payments. Didn't you just say that? A Which included the option, if it were exercised. Q Plaintiff's Exhibit 2 was not drawn at that time, was it; it wasn't in existence? A What is Plaintiff's Exhibit 2? Q That's the agreement with them, with Mobile Hydraulic. It was typed up and signed about a week later after this meeting, wasn't it? A Yes, right."

Respondents were entitled to have Instruction No. 5 submitted to the jury if there was evidence in the case to support it. *Moore v. Parks*, 458 S.W.2d 344, 349[9, 10]

(Mo.1970); *Wyatt v. Southwestern Bell Telephone Co.*, 573 S.W.2d 386, 390[5–7] (Mo. App.1978), and the evidence must be considered in its light most favorable to respondents as it bears upon the propriety of the giving of the instruction. *Alaska Federal Savings and Loan Association v. Hoffman*, 485 S.W.2d 118, 120[1] (Mo.App.1972).

■ The elements of an accord and satisfaction are set forth at page 123 of the *Alaska Federal* case: " 'Strictly speaking, a true accord and satisfaction consists of two elements expressed in that phrase. Accord is the agreement whereby one party agrees to give or perform, and the other to accept, in satisfaction of a claim arising from contract or tort, something other than or different from what he is or thinks himself entitled to. Satisfaction is the performance of such agreement. (Citing authority) * * *.' " In this case, as the jury could find, the accord came about when appellant, Joe, and Mr. Powell met in Slyter's office prior to the time the lease option was prepared and executed. At that time, according to Joe, appellant's compensation (for any services) had never been discussed. Appellant, when asked what was customary, said " 'six percent on the lease, and I ought to have a fee on the option if it's exercised.' " Thus, clearly, as the jury could find that appellant's demand was for both aspects of the negotiations, not two, separate and distinct claims, as he contends. Joe's position was that appellant had nothing to do with procuring the option to purchase from Davis. Thus, the appellant's claim, not only then being unliquidated, was in dispute. Then followed Joe's offer to pay the commission on the lease, but nothing on the option. Appellant accepted that offer, "something other and different from what he is or thinks himself entitled to", *Alaska Federal*, supra, and the accord arose. This was followed by Joe's monthly payments of six percent on rentals to appellant until Joe got into financial difficulties, which culminated in suspension of rental payments in consideration of Joe's agreement to pay 10% interest. Then, upon appellant's demand for commission on the sale, which was again rejected by Joe, appellant accepted the balance due, with in-

230

terest, upon the original accord and satisfaction occurred. Appellant's cited cases, *Collins v. Gaskill*, 359 Mo. 171, 221 S.W.2d 181 (1949); and *Seibel v. Harry S. Surkamp Investment Co.*, 328 S.W.2d 179 (Mo.App. 1959), holding that there is no consideration furnished by payment by a debtor of a sum conceded to be due for the discharge of a disputed claim for an additional amount, are inapposite because there is here but one claim for the amount due, a jury question, from which arose the accord and satisfaction, as the jury was entitled to find under the evidence.

Appellant's second point, also attacking Instruction No. 5, postulates that the lease commission was a liquidated claim separate from the claim for sale commission, and the instruction was in error for failing to confine the "dispute" to the claim for "liquidated" lease commission. The contention ignores what the jury could find as to a dispute upon both claims initially, and the accord which then arose as above set forth. The court did not err in giving Instruction No. 5.

The judgment is affirmed.

All concur.