Floyd BECKER, J. R. Baker, and St. Francois County, Missouri, Plaintiffs-Appellants,

v.

TOWER NATIONAL LIFE INVESTMENT COMPANY, a Corporation, Defendant-Respondent.

No. 51213.

Supreme Court of Missouri, Division No. 2.

Sept. 12, 1966.

Motion for Rehearing or for Transfer to Court En Banc Denied Oct. 10, 1966.

Roberts & Roberts, by Raymond R. Roberts, Farmington, for appellant, Floyd Becker.

Daniel, Clampett, Ellis, Rittershouse & Dalton, William A. R. Dalton, Springfield, for respondent, Tower Nat. Life Investment Co.

FINCH, Judge.

Plaintiff Becker brought suit in two counts based on a subscription agreement for the purchase by him of 2,000 shares of stock in defendant Tower National Life Investment Company, herein referred to as Tower Investment. The suit alternatively sought issuance of 2,000 shares of stock or $40,000, the alleged value thereof. The case was tried without a jury. The trial court held that the subscription agreement submitted by Becker was rejected by Tower Investment and denied recovery to Becker on either count. The court's decree provided for return of the original payment made by Becker at the time he submitted the subscription agreement, but directed that it be paid to plaintiff Baker who had been brought in by the interpleader proceeding.[1] Only Becker filed a motion for new trial and he appealed after it was overruled.

The primary question for determination is whether the subscription agreement for 2,000 shares was accepted by Tower Investment, as Becker contends, or whether it was rejected, as the trial court

---

1. Plaintiffs Baker and St. Francois County were added as parties plaintiff on motion of Tower Investment, after which the latter filed a counterclaim in the nature of a bill in interpleader in which the court was asked to determine to whom the $4,000 originally remitted by Becker should be paid. The interpleader alleged that Becker, Baker and St. Francois County all asserted ownership of the $4,- 000 remitted by Becker with the subscription agreement of December 20, 1963. St. Francois County was not represented at the trial. Baker and Becker stipulated at the beginning of the trial that Baker was to receive $4,000 out of any stock or money damages awarded Becker, and that if recovery was denied and the original payment ordered returned, it was to be paid to Baker.

held. In a jury-waived case we review de novo and reach our own conclusion. Schmitt v. Pierce, Mo., 344 S.W.2d 120.

Tower Investment was organized as a Missouri corporation on April 12, 1963. Thereafter it caused to be organized on September 23, 1963, a Missouri insurance company named Tower National Life Insurance Company, herein sometimes referred to as Insurance Company. Tower Investment issued a prospectus offering for sale to residents of Missouri 950,000 shares of its stock at $2.00 per share. After payment of specified commissions and expenses, the funds were to be used by Tower Investment for the purchase of all the stock in Insurance Company. Attached to the prospectus was a printed form of subscription agreement to be used by prospective purchasers. The signed subscription agreement, accompanied by a remittance for the stock sought to be purchased, was to be submitted to Tower Investment. The subscription agreement included a provision reciting that it and the prospectus "contain the entire agreement between the subscriber and the corporation."

On December 20, 1963, at Farmington, Missouri, Becker executed and delivered to Frank Wolf, an authorized agent of Tower Investment, a subscription agreement for 2,000 shares of Tower Investment stock for $4,000.[2] A check for $4,000 was delivered to Agent Wolf by Becker. Wolf signed the subscription agreement as licensed agent of the company and transmitted it and the $4,000 check to the Home Office of Tower Investment at Springfield, Missouri. Subsequently, Becker's check was deposited by Tower Investment in an escrow account in the Citizens Bank at Springfield, and the check was paid on presentation to the bank on which drawn.

Tower Investment issued no stock to Becker and it contends that the subscription agreement submitted by Becker was rejected by a letter to Becker dated January 31, 1964. That letter read as follows:

"We have your subscription request for 2,000 shares of Tower National Life Investment stock. We had a letter from the Attorney General of Missouri asking that we not issue this stock. A copy of his letter is enclosed.

"As you have been informed the stock issue was completed and since the Attorney General had requested that we not issue said stock to you, it was necessary that we not accept your subscription so that the stock offering could be completed in full. Therefore, your $4,000 is being held by the Citizens Bank of Springfield in a suspense account waiting for the Attorney General or the court. This matter is being handled by our law firm, Walker, Daniel, Clampett, Rittershouse & Ellis.

> Yours very truly,
>
> TOWER NATIONAL LIFE INSURANCE CO.
>
> (Signed) Paul H. Power
> Chairman of Board and
> Chief Executive Officer."[3]

No evidence was offered of any earlier communication, either written or oral, from Tower Investment to Becker.

Becker contends that the letter of January 31 was not effective as a rejection of the subscription agreement because (1) Tower Investment by its prior course of action already had accepted the subscription agreement, and (2) the alleged rejection asserted was not in accordance with the provisions of the subscription agreement in that the purported letter of rejection was

---

2. It was stipulated that Frank Wolf was appointed agent by Tower Investment for the purpose of selling stock in that company. The Chairman of the Board of Tower Investment testified that Wolf had authority to sell 2,000 shares to one person in a county, subject to approval of the administrative office.

3. The contents of the letter of the Attorney General, as well as subsequent correspondence, are not detailed for the reason that it is not necessary or material to the conclusion we reach.

not from Tower Investment (it was from Insurance Company, not a party to the agreement) and the monies paid by Becker were not refunded as required by the provisions of the subscription agreement in the event of rejection.

It is clear that Tower Investment expressly retained a right to reject a subscription agreement submitted to it. The subscription form provided that "The company may reject this application by refunding all monies paid hereon." Furthermore, the prospectus was clear that acceptance was necessary for the agreement to be complete. Under the heading "Manner of Sale" it provided, "Sale is effected by the execution of the form subscription agreement when accompanied by a check, draft or money order and accepted by the Company." Prior to acceptance, the subscription agreement was merely an offer to buy stock. Consequently, our first question must be whether Tower Investment did in fact accept the subscription. If it did, a binding contract with necessary mutuality was created and the company could not reject the subscription at a later date without the consent of the subscriber.

■ We have concluded that the Becker subscription agreement was accepted by Tower Investment prior to its letter of rejection to Becker dated January 31, 1964. There was no express written acceptance communicated to Becker, but the course of conduct of Tower Investment, considered in the light of the provisions of the prospectus and the ancillary escrow agreement, shows an acceptance. The law recognizes that a proposal may be accepted in this manner. "A subscription need not be accepted by the corporation in any particular way, unless this is required by the charter or statute, or expressly or impliedly by the subscription itself, but may be inferred by the conduct of the corporation in entering it in its books, retaining it, demanding payment, or otherwise acting upon it." Fletcher, Cyc. Corp. (Perm.Ed.), Vol. 4, § 1406.

The prospectus provided for an "escrow bank" which was to be the Citizens Bank of Springfield, Missouri. An escrow agreement dated September 24, 1963, was executed by Tower Investment, the Citizens Bank and the Commissioner of Securities for the State of Missouri.[4] The Citizens Bank did

4. The escrow agreement, omitting caption, preamble, signatures, and the paragraph binding heirs, representatives, successors and assigns, was as follows:

"1. *Deposit of Proceeds of Sale.* Upon the execution of the sale of shares of stock pursuant to the Escrow Agreement, the funds so received by the Securities Agent shall be deposited with the Escrow Agent and thereafter distributed in the following manner:

"a) When funds received from the sale of stock under this offering reach $1,-000,000.00, the Escrow Agent shall reimburse the Company for commissions and expenses incurred in an amount not to exceed $126,000.00.

"b) When the balance of the securities permitted to be sold in this offering have been sold, and the funds deposited with the Escrow Agent, the Escrow Agent will then reimburse the Company for the balance of commissions and expenses incurred in an amount which will not exceed $240,000.00, the maximum commissions and expenses authorized in this public offering.

"c) When funds are received by the Escrow Agent from the Company, the Escrow Agent shall invest said funds in 90-day U.S. Treasury bills or short-term U.S. Treasury Notes in order to provide a yield with liquidity and safety.

"d) When the duties set forth in paragraphs "a" and "b" have been discharged, the Escrow Agent shall then release to the Company the balance of the funds held upon receipt of written notice from the company, advising that all shares of stock authorized in the Prospectus have been sold.

"2. *Identification.* The Company shall simultaneously, with the acceptance of each subscriber's Subscription Agreement and tender furnished to the Escrow Agent, the funds received along with the name of the subscriber his address, and the number of shares for which subscription is made.

"3. *Substantial Completion.* After the Company has sold a substantial number of shares offered by the Prospectus, should it thereafter become unable to complete the offering, the Com-

act as escrow agent in connection with the sale of stock pursuant to the prospectus and the Becker check was deposited in that account.

The prospectus, under the heading "Duties of Escrow Agent," provided that "All funds received by the company as a result of the sale of shares under this offering shall be placed in escrow and handled in the manner hereinafter set forth." It goes on to provide that "When funds received from the sale of stock under this offering reach $1,000,000.00," the escrow agent shall disburse specified sums to cover commissions and expenses, and, after the entire proceeds of the sale of stock have been deposited, complete the purchase of the stock of Insurance Company. These provisions refer only to proceeds from the *sale* of stock. There is no provision for deposit in this escrow account of subscribers' remittances pending acceptance, and no provision authorizing withdrawal of funds from the escrow account for the purpose of refunding to subscribers if their subscription is rejected.[5]

This interpretation of the language of the prospectus is confirmed by language used in the escrow agreement entered into between Tower Investment, the Citizens Bank and the Commissioner of Securities. Paragraph 1 provides that funds received "upon the execution of the sale of shares of stock" shall be deposited. Subparagraphs (a) and (b) relate solely to the handling of funds received from the sale of stock. Subparagraph (c) provides for temporary investment of funds in the hands of the escrow bank, a provision not likely to

be intended for funds belonging to a subscriber whose offer to buy has not been accepted. Paragraph 2 provides that Tower Investment, *simultaneously with acceptance* of a subscriber's subscription agreement and the tender of funds, shall deliver those funds to the escrow bank along with certain other data for its records.

Tower Investment makes the point that the subscription agreement and the prospectus constituted the entire agreement between the company and Becker, and that the latter's rights thereunder may not be changed or enlarged by the escrow agreement, to which he was not a party. We agree. This does not mean, however, that we may not look to the provisions of the escrow agreement for assistance in construing the language of the prospectus and interpreting the conduct of Tower Investment in depositing the check in the escrow account. The provisions of the escrow agreement clearly indicate that Tower Investment and the Commissioner of Securities interpreted the language of the prospectus as contemplating that *only proceeds from accepted subscriptions* were to be deposited in the escrow bank, this to be done as and when the subscriptions were accepted. Consequently, we must conclude that Tower Investment knew when it deposited the Becker check in the escrow bank that the funds were committed to the uses and purposes specified in the prospectus, and that this was to be done only following acceptance of the subscription agreement. The deposit of the Becker check in the escrow account under those circumstances constituted an acceptance of the subscription.

missioner of Securities, at his discretion, may cause the monies held in Escrow pursuant to this agreement, to be released to the Company.

"4. *Dissolution and Liquidation.* In the event that the Company is dissolved and liquidated prior to the completion of this offering and the authority granted by the Commissioner of Securities to issue the shares offered in the Prospectus is thus terminated, the Company agrees that it shall bear the burden of all expenses

and commissions expended or paid, and that the Escrow Agent shall return to each subscriber the monies tendered with his subscription."

5. No evidence was offered to show that the $4,000 was withdrawn and placed in a suspense account, although the Insurance Company letter to Becker dated January 31, 1964, had stated this was done.

■ It will be observed that Paragraph 3 of the escrow agreement permits the Commissioner of Securities to release funds to Tower Investment on substantial completion of sale of the stock. Tower Investment argues that this shows funds could be released from the escrow bank under circumstances other than complete sale of 950,000 shares of stock, and that this implies a right to withdraw funds for the purpose of refunding to a subscriber whose subscription agreement was rejected. We find no comparable provision in the prospectus, but, even if there were, this is a limited authorization consistent with the idea that funds on deposit are irrevocably committed to completing the uses and purposes expressed in the prospectus, and is not authority for any release of funds by the escrow bank to a subscriber on the basis that subsequent to the deposit his subscription agreement was rejected by Tower Investment.

■ Another provision in the escrow agreement relied on by Tower Investment is Paragraph 4. It provides for reimbursement of subscribers in the event of the dissolution or liquidation of Tower Investment prior to the issuance of stock in said company. Tower Investment argues that this indicates that there had been no acceptance of the subscription agreements. We ascribe no such meaning to this provision. Clearly, funds of subscribers on deposit with the escrow bank were irrevocably committed to the purposes spelled out in the prospectus. Paragraph 4 is intended to be operative solely in the event Tower Investment is liquidated and there is resulting impossibility of delivery of stock to any subscribers.

■ Finally, Tower Investment suggests that a provision under the "Miscellaneous" heading of the prospectus indicates that all funds would be deposited in the escrow bank when received by it. The paragraph referred to is as follows: "Subscriptions are made by completing the Subscription Agreement. At the time of execution each subscriber shall submit his check, draft or money order in full payment for the shares subscribed. The funds will be held by the Escrow Bank and the net proceeds will be paid to the company." We do not interpret this language to mean that every check is to be deposited in the escrow bank as soon as received, regardless of whether the subscription has been accepted. It provides for payments to the company only, and then of the net proceeds, which would be after deduction of commissions and expenses. This can have reference only to proceeds from actual sales (accepted subscriptions) because unaccepted subscriptions are not subject to deductions, and such payments would be to the subscribers, not to the company. We find nothing in this provision inconsistent with earlier sections of the prospectus which provide for the deposit of sales proceeds only in the escrow bank.

Since we have held that there was an acceptance of Becker's subscription agreement, we need not concern ourselves with the question raised by Becker as to whether the asserted revocation was in compliance with the provisions of the subscription agreement.

■ We come then to the question of what relief is to be given to Becker. Since this is an action on a written contract and defendant's evidence fails to show any defense thereto, we should enter judgment here or remand with directions to the trial court. Central States Life Ins. Co. v. Bloom, 345 Mo. 982, 137 S.W.2d 517; § 512.160, RSMo 1959 and V.A.M.S.

■ Count I of plaintiff's petition sought specific performance of the contract to deliver 2,000 shares of stock. This count seems to have been abandoned, even though never formally dismissed. Becker's motion for new trial complained of the failure of the trial court to enter judgment for the value of the stock on the date stock was issued to others by Tower Investment, but made no reference to failure of the court to grant relief on the count for specific performance. Becker's brief on appeal

says nothing about specific performance. The only reference in defendant's brief on appeal to the question of relief is a statement that apparently the measure of damages in Missouri for failure to issue corporate stock is the reasonable value of the shares at the time of failure to deliver same. Furthermore, there was no evidence offered to show the plaintiff's remedy at law for damages was inadequate. Cases which have granted specific performance of a contract to sell shares of stock have made such evidence a requirement. Wood v. Kansas City Home Tel. Co., 223 Mo. 537, 123 S.W. 6. Consequently, we will not consider equitable relief in the form of specific performance, but will award damages instead.

There are at least two lines of authority as to the proper measure of recovery for breach of a contract to issue and deliver stock. The more widely followed rule fixes as the proper measure of damages the value of the stock at the time of its conversion or at the time of refusal to issue. A rule sometimes referred to as the New York rule permits recovery of the highest value attained by the stock between the time of the conversion or refusal to issue and a reasonable time after the owner has received notice so as to permit him to replace the stock.[6] Missouri seems to follow the majority rule. Brinkerhoff-Faris Trust & Savings Co. v. Home Lumber Co., 118 Mo. 447, 24 S.W. 129; National Surety Corp. v. Hochman, Mo.App., 313 S.W.2d 776. See also St. Louis Perpetual Ins. Co. v. Goodfellow, 9 Mo. 149, although the court in this case noted that there had been no subsequent increase in the value of the stock and that the court was not called upon to decide what, if any, effect such a circumstance would have on the amount of recovery. See also Ostrander v. Messner, Mo. App., 223 S.W. 438.

It is stated in Fletcher, Cyc. Corp. (Perm. Ed.), Vol. 11, § 5117, p. 217, that the New York rule seems to be growing in favor. It is pointed out that in some circumstances mere recovery of the value at the time of the conversion or refusal to deliver does not adequately compensate the plaintiff, particularly in circumstances where the value of the stock is fluctuating and the party does not have knowledge thereof in time to protect himself by purchasing other stock. Under the facts of this particular case, that situation does not exist because Becker knew when he received the letter of January 31, 1964, that Tower Investment was not going to issue stock pursuant to his subscription. Stock was actually issued to others on February 6, 1964, and there was evidence that sales of the stock at that time and immediately thereafter were made, so that it would appear that Becker could have gone into the market and purchased other stock if he had so desired. There is no occasion, therefore, under the facts of this case, for us to consider whether we might follow the New York rule under appropriate circumstances, and we express no opinion thereon.

There was a conflict in the testimony as to the value of stock in Tower Investment at the time of its issuance to other subscribers on February 6, 1964. Bill Wendt, a salesman for Reinholdt & Gardner in their Springfield, Missouri, office, testified as a witness for defendant that he sold Tower Investment stock in February 1964 for $6.00 per share. He made sales in March of that year at $8.75 and $9.50 per share, and in April at $10.00 per share. Value at the time of trial was $3.50 bid and $4.50 asked. Frank Wolf, who had been an agent for defendant and took the subscription agreement from Becker, testified for plaintiff that "immediately or shortly thereafter it was trading in the area of Ten Dollars a

---

6. For a discussion of the measure of damages and citation of cases from various states, including Missouri, see Fletcher, Cyc. Corp. (Perm.Ed.), Vol. 11, § 5117. See also Annotation, 22 A.L.R.2d 62.

Some cases deal with conversion of stock and others with refusal to issue or deliver or with refusal to register. The measure of damages is usually the same.

share." Plaintiff Baker testified that the stock was selling at $10.00 per share immediately after issuance.

We have concluded that the most convincing testimony as to the value of the stock was that of Bill Wendt, who had made actual sales in February at $6.00 per share. Familiarity with values of stock was necessary in his business of working as a salesman for a brokerage firm. Witness Wolf was not so specific as to price or time. Accordingly, we find that the value of the stock on February 6, 1964, the date of the breach, was $6.00 per share, and that recovery by plaintiff should be on that basis. Pursuant to the stipulation between Becker and Baker, the judgment should provide for recovery of $4,000 by Baker and $8,000 by Becker.

The judgment is reversed and the case remanded with directions to the trial court to enter judgment in accordance with the views herein expressed.

All of the Judges concur.