JEFF–COLE QUARRIES, INC., Respondent,

v.

Frances M. BELL and Mary Louise Hilton, Appellants.

No. 54546.

Supreme Court of Missouri, Division No. 2.

May 11, 1970.

David Brydon, Victor Tell Neff, Graham & Hawkins, Morris E. Osburn, Jefferson City, for Jeff-Cole Quarries, Inc.

Lawrence J. Lee, St. Louis, for Frances M. Bell and Mary Louise Hilton.

HENRY I. EAGER, Special Commissioner.

Plaintiff, a corporation, filed suit for a money judgment on account of work done under a contract for a removal of rock from building sites, and to establish a mechanic's lien upon the real estate. The amount claimed in the petition was $57,375, that amount being allegedly based upon a contract price of $15 per cubic yard. Plaintiff attached to the petition as exhibits a copy of its lien statement and a copy of the contract. The defendants were Frances M. Bell, Mary Louise Hilton, A. E. Bell, Irvin Hilton (the latter two being the husbands of the women), and Meridian Construction Company, a Missouri corporation (which we shall designate as Meridian). After rulings on various motions all defendants filed answers. It will not be necessary to review the pleadings in any detail; Mr. Bell and Mr. Hilton denied ownership of the real estate; all four individuals alleged that it was owned solely by the two women; the latter asserted their ownership as tenants in common and denied that the other defendants were ever their agents; all four individuals denied generally the plaintiff's allegations. Meridian admitted that it entered into a building contract with Mrs. Bell and Mrs. Hilton to construct improvements on the property at a fixed price, and that it entered into a contract with plaintiff as a subcontractor for the removal of rock. It specifically denied plaintiff's allegations of the amount of rock removed, and generally denied the substantive claims of plaintiff. We need not discuss the motions for production and inspection or the various interrogatories, objections and answers. No point is made here concerning them. These cover many pages of the transcript.

Suit was filed in Cole County where the real estate is located; the case was transferred to Osage County on a change of venue and a jury was waived. At the conclusion of a rather lengthy trial, the court found the issues for plaintiff against Meridian and the two women, and entered judgment against them for $51,645; it also found that plaintiff was entitled to a mechanic's lien on the real estate, describing it; it ordered that execution be levied on the real estate if no sufficient property of those three defendants should be found otherwise. Plaintiff's petition was *dismissed* by the court as to the defendants Irvin Hilton and A. E. Bell.

A detailed joint motion for a new trial was filed and overruled; we may say here that it fairly raised all points now to be considered. The two women filed a joint notice of appeal and Meridian filed its own notice. Thereafter Meridian voluntarily dismissed its appeal in this Court. The sole remaining defendants here are Mrs. Hilton and Mrs. Bell.

The trial court made no findings of fact and entered no conclusions of law. None were requested. We are left somewhat in the dark, therefore, concerning its views both on the facts and the law. A detailed statement of the facts will be necessary. The individual defendants live in St. Louis. The business address used for all defendants was 7827 Olive Blvd., St. Louis, a one-story building. Mr. Bell was an accountant, with his business office there; Mr. Hilton was, as he said, "basically in the construction business," with his office there, and he had been so engaged since 1950. He had organized the Meridian Construction Company, a Missouri corporation, in which he owned all the stock. He and Mr. Bell and Mrs. Bell were the directors and officers; he was its president. It had done general construction work for others for some years before the present controversy arose. Mr. Hilton was also interested in (and perhaps organized) another Missouri corporation, Olive Realty and Development Corporation, in which he owned at least 50% of the stock; he and the Bells were the officers and directors; originally others (not designated) were interested parties. Hilton testified that the corporation was not very active, and that he was authorized by its By-Laws to transact real estate business for it.

Mr. Hilton testified: that his wife and Mrs. Bell had money of their own and that they were looking for investments; that they had made prior investments together with their own money; that he learned of the availability of the real estate now in question, consulted with the wives, and negotiated a sales contract from the owners to Olive Realty and Development Corporation (hereafter called "Olive"), actually as a "straw" buyer; that he, on behalf of Olive, assigned this contract to Frances M. Bell and Mary Louise Hilton on November 15, 1962, and that the warranty deeds from the sellers were made direct to "Frances M. Bell and Mary Louise Hilton," as grantees.

Other nearby apartments had been built by Meridian for Mrs. Hilton and Mrs. Bell prior to the present controversy. The sale price on the land now in question was $42,000, paid in cash on closing (less a $500 deposit). The sales contract and the warranty deeds were received in evidence as exhibits. Mr. Hilton signed an acceptance of the closing statement on April 4, 1963.

On August 3, 1965, a construction contract was executed by Mrs. Bell and Mrs. Hilton as owners and the Meridian Construction Company as "General Contractor," Mr. Hilton signing for the corporation as "President." In that contract it was stipulated: that Meridian should be the general contractor; that it agreed to procure and furnish all labor, materials and equipment, subcontractors, and all else required for the construction of three ten-family apartment buildings on the property, two and one-half stories each, of the size of 44 feet by 74 feet, to be designated as 607, 609, and 611 Blair Drive North, in Jefferson City; that the contractor would

provide all necessary insurance, and that it guaranteed against defects in materials and workmanship; that the owners agreed not to delay the progress of construction, that they would provide fire, hail, windstorm and vandalism insurance, and that they would pay to the "General Contractor" the sum of $77,797.87 for each completed building, or a total of $233,393.61. The contract further provided: that the buildings would be constructed according to the designs of certain named architects, that changes must be set forth and accepted by supplemental contracts in writing with adjustment of the sum to be paid, that payments would be made as the work progressed but not to exceed the ratio of the total sum to the percentage of completion; and that the contractor should hold the owners harmless from all liens arising from the construction. Certain formal provisions were also contained in the contract such as one prohibiting assignments, for arbitration, etc., which are immaterial here. The evidence showed that Meridian thereafter arranged for and made all subcontracts, and that it purchased all materials, except for a few minor items which a Mr. Stockman purchased locally.

As already indicated, other apartments had been built by Meridian beginning in 1963 for these same owners, under similar or almost identical arrangements, and at the same unit price; they had been finished prior to February, 1964, for rent was then being collected. On the present project a construction loan was arranged with Community Federal Savings & Loan Company of St. Louis; the husbands, or in any event Mr. Hilton, helped in making those arrangements and the lender insisted that both husbands sign the note and deed of trust because of their marital interests. The amount of this loan constituted (supposedly) the entire construction cost, exclusive of certain minor incidental expenses. An attorney, Mr. Tucker, also assisted the wives in those negotiations and, according to Mr. Hilton, represented them. The construction contract was made with-out competitive bidding, and it was apparently intended from the beginning that Meridian would be the general contractor. Meridian was paid for its work as the construction proceeded, but later payments from the loan were apparently held up because of this litigation. Any profits of Meridian were taken by Mr. Hilton as salary or dividends.

At some time around September 5, 1965, Meridian contracted with Willard Stockman, a construction contractor of Jefferson City, as a subcontractor, to supervise the construction of these three apartment buildings for a stated fee, and also to perform all carpenter labor (not furnishing materials) at a fixed fee. This contract covered much detail. (Stockman had done the same work for Meridian on the other buildings already completed.) Mr. Spencer Thomas, a local engineer, staked out the area and set grade stakes; he testified that he did all of this at one time. Another contractor had done some grading (which he described as "a lot of grading," with some rock) before Mr. Adrian, President of plaintiff company, was called to the job. At that time there was loose dirt, solid rock, and some rock not classed as solid on the site. Mr. Stockman estimated that not over 25% of the material to be removed was solid rock, i.e., rock which had to be blasted. Mr. Adrian testified that he saw the three building sites which were staked and told Stockman that he would excavate the rock for $14,000 or at $15 a cubic yard; that Stockman said he would have to let him know later; that Stockman called later and stated that they would take the offer of $15 a cubic yard. His company proceeded with the work; he testified: that Meridian had later decided to excavate an additional area outside the building sites; that all the rock excavated was solid and that they blasted it and hauled it out; that some dirt had previously been removed; that he had originally estimated that there were 1,000 yards of rock in the three building sites; that he did not estimate the additional area as he was work-

ing by the yard. Defendants offered to prove: that plaintiff originally offered to excavate the "whole area" for $14,000 or for $15 a cubic yard and that the whole area had been staked at one time before the work began; that they raised the elevations one foot so as to require less excavation and then accepted the $15 offer.

This offer of proof was refused on the ground that it varied the written contract.

Mr. Adrian testified that in view of the additional work (as he described it) he had a form of contract prepared and sent it over to the job by his foreman. This was typed on the letterhead of plaintiff and is as follows:

"JEFF–COLE QUARRIES, INC.

General Contractors
830 Fairmount Blvd.   Phone 636–9067
Jefferson City, Missouri

October 19, 1965

AN AGREEMENT

Jeff-Cole Quarries hereby agrees to remove rock from the site on Blair Street known as the Capital View Apartments to the grades as directed by P. S. Thomas Engineering Company for fifteen dollars ($15.00) per cubic yard.

To be measured by P. S. Thomas

(signed) Harry H. Adrian
         JEFF–COLE QUARRIES, Harry Adrian

(signed) Meridian Construction Co
         Irvin Hilton, Pres
         OWNER OR REPRESENTATIVE

"

————◆————

The paper was received in evidence as Plaintiff's Exhibit 3. The names of Adrian, Hilton and Meridian and the "To be measured by P. S. Thomas" were written in ink. The rest was typed. Mr. Hilton signed the paper on the job, at some time after· plaintiff's work began. Mr. Hilton testified that he signed the contract because he thought it would be cheaper than the $14,000 price. Mr. Adrian further testified as· follows: "Q. It was your understanding that Mr. Stockman worked for the Meridian Construction Company? A. Yes, sir. Q. And it was your understanding that the Meridian Construction Company was the general contractor on this job? A. Yes, sir. Q. Is that right? A. Yes, sir. * * * Q. Did you know whether or not Willard Stockman was the contractor to do the carpentry work on the buildings? A. Yes, I assumed that he was. Q. And he was the man that you might say was then to supervise the excavation and the construction, the general construction? A. That's right. Q. And it was your understanding that he worked for Meridian? A. That's right. Q. And you meant to deal with Meridian Construction Company as the general contractor on the job, is that right? A. Yes, sir. * * * Q. You dealt strictly with Mr. Stockman? A. Yes, sir. Q. And to whom did you look for payment? A. Meridian Construction."

Plaintiff's last work was done on November 3, 1965, according to its lien state-

ment. The evidence as to the amount of solid rock removed is most unsatisfactory. Plaintiff attempted to prove this by testimony and exhibits supposedly showing the number of truck loads of material hauled away. Even the total yardage of material (rock or not) from that evidence is most indefinite, and except for Adrian's testimony (who was there about twice a day) that all such material was solid rock which had been blasted, there is much indication that a major part was loose rock or dirt. The engineer who was supposed to measure the rock made conflicting statements as to the amounts of material; his first statement formed the basis for plaintiff's claim, but he later wrote a different statement and he testified that the first statement made by his *office* (3,825 yards of rock) was in error, and that in fact there was no accurate way to measure the material removed until the excavation was made, and that even then there was no way for him or anyone else to tell how much of it was solid rock; also that material had been removed below the level requested. The contract was for "rock," and both parties construed this to mean solid rock; incidentally, we have failed to find how the trial court arrived at its figure of $51,645.00. However, appellants have not briefed any question attacking the amount of the judgment or the sufficiency of the evidence to support the particular amount. We therefore pass on to such additional facts as are claimed to be material.

Mr. Stockman saw Mrs. Hilton at the job site perhaps twice; he did not see Mrs. Bell. There was no evidence that Mrs. Hilton did anything while there. Jack Jordan, of Jordan & Kolb, Realtors, arranged the sale of the real estate and from the time the first group of apartments was completed he had managed the property, made leases, and collected the rents; his office prepared the leases. They were signed by "Jordan and Kolb, Realtors Leasing Agents," but prior to March 28, 1966, the leases (or some of them) carried the name of "Meridian Construction Com-

pany" as Lessor, although Jordan knew the state of the legal title. Jordan's explanation was that his handling of some minor construction costs had been with Meridian and that he just "followed through." Jordan's office deposited all rental checks (they were made to his firm) in an escrow account in the name of Capital House Apartments, and remitted the money periodically (from February, 1964 to December, 1965) in lump sums payable to "Frances Bell and Mary L. Hilton," after paying the necessary expenses. Jordan and one or more of his employees signed the checks. Thereafter the method was changed at the direction of Mrs. Hilton and Mrs. Bell (one or both of whom had consulted Jordan several times); when rent checks were thereafter deposited, duplicate deposit slips were sent to the women at 7828 Olive, St. Louis, or to "Capital House Apartments" and they in turn would remit for commissions and expenses. Mrs. Hilton, Mrs. Bell, Mr. Hilton and Mr. Bell were said to have authority to draw on the account but there was no evidence as to the withdrawals. It seems from all the evidence, that any leases showing Meridian as lessor (prior to March, 1966) were made on the first group of apartments (not involved here), for it is most doubtful that any of the three involved here had been completed by that time. Rentals on the first group had been collected, at least, from February 19, 1964. In October, 1964 (approximately ten months before the contract was signed for the present construction) the owners of adjacent property wrote Jordan and Kolb complaining of the discharge of surface water from the real estate; they had not checked the legal ownership. On March 2, 1966, Meridian Construction Company, by Mr. Hilton and Mr. Bell as officers, wrote those owners, stating: that when the complaint was made to Mr. Jordan they had made an inspection, called in a construction man, and talked with Mr. Jordan; that they did not realize that the matter had not been "amicably settled," that a complete "review" had been ordered, and a copy of

that report was enclosed, and a conference was suggested. The only significance of the letter is that it was stated in the first paragraph, "We are the prime contractors and owners of the project." It is impossible to tell whether this matter concerned the first group of apartments or land for the second group or both. On the witness stand Mr. Hilton's explanation on cross-examination was that counsel was taking that statement out of context, and that "as owners we were referring to our wives." Among other miscellaneous matters we note, to keep the record clear: that when the warranty deeds were recorded they were returned to Mr. Hilton, at the St. Louis business address; that the meeting of corporate directors of Meridian which authorized the execution of the construction contract was not held until two days after the contract was executed by Mr. Hilton; that Mr. Adrian, President of plaintiff, dealt solely with Mr. Stockman and, so far as the record shows, never saw the defendants or Mr. Hilton.

The lien statement was filed on April 26, 1966, about a week before the expiration of six months after the last work was done (by plaintiff's own statement); it was *not* filed within four months, as all concede. (And the record shows that this was not the fault of plaintiff's present attorneys.)

Considerable space in respondent's brief is consumed in discussing the method of review applicable in this case. Both forms of relief sought by plaintiff are actions at law, one for a money judgment and one for the enforcement of a single lien. Section 429.330, RSMo 1959, V.A.M.S. Rule 73.01 provides that the court shall review such a case upon both the law and the evidence as in suits of an equitable nature, that due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses, and that the judgment shall not be set aside unless clearly erroneous. We have held specifically and recently that in a jury-waived case "we review de novo and reach our own conclusion." Becker v. Tower Na-

tional Life Investment Co., Mo., 406 S. W.2d 553; see also, Emerson v. Treadway, Mo.App., 270 S.W.2d 614; Weaver v. Jordan, Mo.App., 362 S.W.2d 66; but we do not set aside the judgment unless we find it to be clearly erroneous. It is wholly unnecessary to review the various cases cited by respondent on this point, some of which were jury tried cases.

The real issue here is whether the act of Meridian, through Mr. Hilton, in signing the contract of plaintiff, was then binding upon Mrs. Hilton and Mrs. Bell individually, either upon a theory of agency or joint venture. The briefs here run off at slightly different angles. Appellants have briefed these points: (1) that there was no such agency, either actual, implied, or apparent; (2) that a lien was improperly imposed both for the reason just stated above (no agency for the property owners), and the further reason that plaintiff was a subcontractor and did not file its lien within four months as required by Section 429.080. The plaintiff (respondent) answers Point 1 somewhat obliquely by asserting that Meridian and the present defendants (and also Hilton and Bell individually) were joint adventurers in the development of the apartments, and that the contract is binding upon all members of the venture when executed by any one of them. As to Point 2, plaintiff insists that it was an "original contractor" because the contract was executed by a member of the joint venture and was thus binding on all as principals. Plaintiff's brief touches very lightly on the issue of agency, but since appellants have briefed it, and since it is an issue on the face of the record (and we do not know the theory of the trial court) we shall consider that question first. To some extent the existence of agency and of joint venture overlap.

We are dealing here with one single question,—did Meridian Construction Company have the authority of Mrs. Hilton and Mrs. Bell to execute the contract of October 19, 1965, for them and on their behalf as *owners* of the property?

No party here claims that Meridian or Hilton had any such express authority. Plaintiff relies upon the conduct of all persons concerned to create an implied or apparent authority (largely transposed into a joint venture). We need not consider here implied authority, which generally concerns the extent of an express authority actually granted. 3 Am.Jur.2d Agency, § 71; Prior v. Hager, Mo.App., 440 S.W.2d 167. Our concern is with apparent authority. That results from a manifestation by the supposed principal that another is his agent, "the manifestation being made to a third person * * *"; normally it results from a prior relation of principal and agent, but not necessarily; but it exists "only with regard to those who believe and have reason to believe that there is authority; there can be no apparent authority created by an undisclosed principal." Restatement of Agency 2d, § 8, p. 30. See also, 3 Am. Jur.2d Agency, § 73 et seq. In the latter text it is stated that the third person must deal in good faith with the agent upon the faith of such "holding out" by the supposed principal, *believing* and having reasonable ground to believe that the agent has the authority. All of the texts and decided cases recognize that apparent authority must arise from acts of the alleged principal, and *not* from any acts of the agent; an agent cannot create his own authority. One who deals with a person as *principal* cannot later set up that person's apparent authority to act for another so as to hold the latter person liable as principal, when he did not previously rely upon any such authority. 3 Am.Jur.2d Agency, § 75.

The rules announced in the Restatement, supra, were adopted and quoted in Continental-St. Louis Corp. v. Ray Scharf Vending Co., Mo.App., 400 S.W.2d 467, where it was held that there was no manifestation of consent by the principal to the act of the agent. There the agent was assuming to act for his employer but in a transaction of an unusual type. See also: State ex rel. Massman v. Bland, Banc, 355 Mo. 17, 194 S.W.2d 42; Wyler Watch Agency v. Hooker, Mo.App., 280 S.W.2d 849; Seibel v. Harry S. Surkamp Inv. Co., Mo.App., 328 S.W.2d 179; Erickson v. Civic Plaza National Bank of Kansas City, Mo.App., 422 S.W.2d 373. In Wyler, the Court said, loc. cit. 854: "Apparent authority of an agent, estopping the principal from denying such authority as against an innocent third person, is that authority which a reasonably prudent man, using diligence and discretion, in view of the principal's conduct naturally would suppose the agent to possess. State ex rel. Massman v. Bland, 355 Mo. 17, 194 S.W.2d 42, 45–46(5); City of Springfield, for Use and Benefit of Horton v. Koch, 228 Mo. App. 511, 72 S.W.2d 191, 194(7), 195(9). ' * * * (T)he party who claims reliance (on an agent's apparent authority) must not have closed his eyes to warning or inconsistent circumstances. Authority is not "apparent" simply because the party claiming has acted upon his conclusions * * * (nor) simply because it looked so to him. It is not a situation where one may read while he runs. It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions * * * brought to his notice, would reasonably rely, that a case is presented within the operation of the rule.' Mechem on Agency (2nd Ed.), Vol. 1, Sec. 726, p. 513."

We have concluded that if the trial court found liability here on the theory of agency, the judgment was clearly erroneous. No acts of Mrs. Hilton or Mrs. Bell are shown which would actually indicate any intent (or acquiescence) to constitute Meridian or Hilton as their *agent* in the construction of the apartments. The most that is shown is that they permitted Hilton to help them to negotiate the real estate purchase (with their own money) and to negotiate the loan. Hilton did sign the closing statement for the purchase. It is not shown whether the women even knew that there would be a closing state-

ment, but if so, it was simply one of the details of the purchase. Thereafter they entered into a very specific and detailed contract with Meridian as *general contractor* to build the apartment. The very existence of that contract, performed by Meridian, is wholly inconsistent with the existence of an agency. We cannot disregard that contract, nor can plaintiff do so. One cannot be an independent contractor and at the same time be an agent for the same purposes. And the evidence shows that Meridian did in fact perform the duties of a general contractor by employing all the subcontractors, purchasing all the materials and hiring and paying a supervisor. If more is needed, one cannot escape the fact that the plaintiff did not *rely* upon any claimed agency of Meridian for the actual owners, and it cannot now reverse its position. Mr. Adrian specifically testified: that he understood that Meridian was the general contractor on the job, that he knew Stockman worked for Meridian, and that "he meant to deal with Meridian Construction Company as the *general contractor* on the job * * *." (Italics ours.) Thus, he considered no agency relationship and looked to *no one* as a principal of Meridian. He had not even gone to the trouble to find out from the records who were the owners of the real estate. In view of these controlling facts, the further contentions of plaintiff are of rather slight consequence, i.e.: the fact that Mrs. Bell was a director and officer of Meridian; that Meridian was owned and controlled by Hilton; that leases prior to March 28, 1966, were issued in the name of Meridian (probably on the *other* buildings previously constructed) especially when the leases were prepared by Jordan and Kolb as "leasing agents"; that the Olive Corporation was a mere straw holder of the purchase contract and was controlled by Hilton; that Hilton negotiated the purchase of the land; that the deeds, after recording, were returned to Hilton; that Hilton and Bell were required to cosign the note and deed of trust (a very usual precaution); that no competitive bids were tak-

en; and that the meeting of Meridian's directors was held two days after the construction contract was signed (perhaps a rather "sloppy" procedure, but no one claims here that the contract was thereby invalidated). None of the foregoing demonstrates any *grant* of power, actual or apparent, *from the owners* to the general contractor to sign on *their* behalf and as binding on them, a contract which was merely an integral part of the construction project and normally falling within the contractor's obligations. The fact that Hilton so signed Meridian's name over a line which plaintiff had designated for the "owner or representative" cannot in itself create or evidence authority in the agent, who cannot thus create any authority in himself. The same may be said concerning the letter of Hilton and Bell for Meridian stating that "we are the prime contractors and owners of the project"; incidentally, that letter was written nearly five months after the contract was signed, and it is not specifically shown which project it referred to. Meridian was an entirely separate entity; the women, individually, were concededly the record owners. The evidence does not fairly show that plaintiff acted within the requirements necessary for a showing of apparent authority to Meridian, and there is no evidence to show that the two women did anything to justify any such reliance on plaintiff's part. There was no valid agency.

■ We now consider plaintiff's theory of a "joint adventure," generally referred to now, we believe, as a "joint venture." Several Missouri cases have defined this, and it may simplify matters to quote that definition, as stated in State ex rel. McCrory v. Bland, 355 Mo. 706, 197 S.W.2d 669, 672, 168 A.L.R. 929: " 'There is an abundance of case law on the subject. A "joint adventure" has been defined as an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. * * * *It can arise only by*

*contract or agreement between the parties.* [Italics ours.] * * * But the joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proven by facts and circumstances showing such enterprise was in fact entered into. * * * There must be some active participation in the enterprise, some control over the subject-matter thereof or property engaged therein.' " The opinion indicates also that there need be no express agreement to share losses, for if the status is established, such an agreement may be implied; and also, that a corporation may, by contract, become a part of a joint venture. Plaintiff also cites: Hobart-Lee Tie Co. v. Grodsky, 329 Mo. 706, 46 S.W.2d 859; Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 4 A.L.R.2d 826; Scott v. Kempland, Mo., 264 S.W.2d 349; Gales v. Weldon, Mo., 282 S.W.2d 522; Pigg v. Bridges, Mo., 352 S.W.2d 28; Allison v. Dilsaver, Mo.App., 387 S.W.2d 206; Morrison v. Caspersen, Mo., 323 S.W.2d 697; Ewalt v. Hudson, Mo.App., 223 S.W.2d 132; Denny v. Guyton, Banc, 327 Mo. 1030, 40 S.W.2d 562; Daily v. Scott, Mo.App., 74 S.W.2d 881; and Buck v. G. W. L. Const. Co. (DC Mo.), 114 F.Supp. 448. Those cases recognize the rules by which a joint venture is established and governed, but the facts in each are so widely divergent from ours that it would be useless to discuss them. In some, the claim of a joint venture was *not sustained by the court.* See also: Bell v. Green, Mo., 423 S.W.2d 724; Southwest Drayage Co., Inc. v. Crawford Moving Vans, Inc., Mo., 377 S.W.2d 293, and Holt v. Queen City Loan & Inv., Inc., Mo., 377 S.W.2d 393, where also the existence of joint ventures was denied. In some of plaintiff's cited cases there were express agreements to participate, work, and share in a joint venture. It is clear that there must be a showing that *such* a relationship was *in fact* created. Pigg, supra, at 352 S.W.2d loc. cit. 33; 46 Am. Jur.2d Joint Ventures, § 1 et seq.

Counsel assert (Respondent's brief page 15) that there was a joint venture between "Mr. and Mrs. Hilton, Mr. and Mrs. Bell and Mr. Hilton's alter ego corporations * * *." In other words, they contend that Hilton and Bell individually were among the co-adventurers. The trial court dismissed the petition as to those defendants when it rendered judgment; it necessarily follows that the trial court did *not* proceed on plaintiff's theory of joint venture, for if such exists, *all* are liable for the act of one, as in a partnership. This, per se, detracts much from the asserted theory of a joint venture. Nevertheless, we discuss the question.

What we have already said on the question of agency has considerable applicability here; for, if the two women had done nothing, in and of themselves, to create an agency, they had probably done nothing to create a joint venture. We note here also that a joint venture is definitely to be distinguished from the relationship of owner and independent contractor. 46 Am.Jur.2d Joint Ventures, § 1, et seq., and that there must be a joint property interest in the subject matter. id. Plaintiff relies upon the facts and circumstances as already discussed to sustain its contention, and the facts need no further elaboration. Counsel argue: that all received "mutual benefit," and that each played some part; that Mr. Hilton received a salary or dividends from Meridian, that three of the individuals were officers and directors of Meridian and that Hilton controlled it; that Meridian, through Hilton, signed plaintiff's contract as "owner or representative"; the writing of the letter to adjoining landowners; and the fact that Mrs. Bell could help control Meridian through her position as a director. We pause here to amplify one point, namely, the argument that Mr. Hilton and Mr. Bell "applied or could have applied, portions of those profits (the rentals) to their own personal uses." This speculation (Brief p. 23) is based upon the evidence that in perhaps the fall of 1966 (not very definite) the es-

crow rental account was changed from the realtor's name to one listed as "Capital House Apartments," with authority in both of the women and in Mr. Hilton and Mr. Bell to write checks. There is *no* evidence that either Hilton or Bell ever did so, and consequently, no evidence that either of them thus shared in any "profits," except perhaps for Hilton's salary from Meridian, which was a separate proposition.

■ There certainly was no evidence of an express agreement to create a joint venture; the question here is whether the evidence shows, by facts and circumstances, that one was *in fact created*. We hold that the evidence does not do so, and that, if the trial court's decision was based on that theory (which it obviously was not), it was clearly erroneous.

■ The controlling consideration here is that the parties entered into a detailed contract by which Meridian, as general contractor (and certainly as an independent contractor), was to construct the buildings for the two women who owned the real estate upon certain conditions and for a fixed price. There is *no* contention here that the contract was invalid for any reason, and there is no sufficient evidence that this contract did not represent the intent of the parties. The existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint venture by implication. Gales v. Weldon, Mo., 282 S.W.2d 522; 46 Am.Jur.2d Joint Ventures, § 1, et seq. The circumstances which plaintiff argues here do not establish that Mrs. Hilton and Mrs. Bell intended to, and *in fact did*, voluntarily enter into a contract of joint venture whereby they, Mr. Hilton, Mr. Bell, and Meridian should have a community of interest in the property, that all should actively participate, should share the profits, should have joint and several control, and also with a duty to share the losses. We note the following additional matters as indicating that there was no joint venture: the conduct of Mr. Hilton alone or combined with that of Meridian cannot create a joint venture; the women here only bought the land, paid their money, took title in their own names, got a loan, and contracted for the construction of the apartments. Their supposed consent to further acts rests largely upon speculation; there is no evidence that they participated in or controlled the construction; there is no evidence of the sharing of any profits (as already indicated). The existence of a joint venture for the operation of a business over a period of years is unusual, at best, Morrison v. Caspersen, Mo., 323 S.W.2d 697; there must have been an *intent* on the part of these defendants to create a joint venture, and they must have *participated* in the enterprise. Denny v. Guyton, Banc, 327 Mo. 1030, 40 S.W.2d 562. Mr. Hilton and Mr. Bell put no money into the project, Mr. Bell rendered no services of any consequence, and substantially all of Mr. Hilton's services (after the purchase of the real estate) were rendered for Meridian. Meridian, through Hilton, had *sole* charge of the construction; all of the rental proceeds (so far as shown) were remitted to Mrs. Hilton and Mrs. Bell, individually, and their funds were maintained in a separate, joint account.

■ Even if the trial court disbelieved all of Mr. Hilton's testimony, the plaintiff still did not produce evidence showing the legal requirements of a joint venture. The fact that Mrs. Hilton and Mrs. Bell did not appear cannot make out a case for the plaintiff. A mere inference that their testimony would be unfavorable cannot be used affirmatively to create a case for plaintiff where it otherwise has made none. We thus hold that there was no joint venture and that, if the trial court so held (which it obviously did not) its judgment was clearly erroneous.

■ The remaining issue is the propriety of the judgment establishing a lien on the property. That question has been determined by what we have already decided. Plaintiff's theory was that its contract

was made directly with the owners because, (1) there was a joint venture, or (2) Meridian was acting as the agent of the owners. We have held that neither theory is valid. Consequently, plaintiff was not an original contractor having, under Section 429.080, six months in which to file its lien. We hold that plaintiff was a subcontractor, having four months to file, and that its lien was filed out of time. None of the lien cases cited by plaintiff (and they have all been considered) are persuasive on the facts of this case. We mention one, namely, Vasquez v. Village Center, Inc., Mo., 362 S.W.2d 588, which is not applicable on its facts, but in which the Court used the following language, emphasized here by counsel: " * * * under the provisions of Section 429.080, the lien account was timely filed only if plaintiff was an original contractor; or, in other words, if he contracted with the 'owner or proprietor * * *, or his agent, trustee, contractor or subcontractor * * *.' It is essential to show the timely filing of the lien account in order to establish the right to a mechanic's lien." Counsel argue that this means that even if plaintiff was a subcontractor it would still have six months in which to file its lien. Such a construction would be contrary to all the adjudicated Missouri cases on the subject, and we are convinced that the court in that case meant no such thing. Section 429.150 defines "owner or proprietor" and it certainly does not include a subcontractor. The Court was quoting from Section 429.010, which provides generally for the creation of all liens,—of original contractors, subcontractors, mechanics, laborers and those who furnish materials; the method to be followed by each class of lienors is provided in later sections, and rather specifically by Section 429.080 which gives a subcontractor (included among "every other person") four months in which to file. In Vasquez, supra, the contract was made with plaintiff by all the beneficial owners, and a corporation formed by them later ratified it; at that time there was no general contractor. The case is in no way persuasive here.

The present difficulties could have been obviated very easily if plaintiff had filed its lien within four months, as required. We note again, however, that present counsel, who have done a most competent job in seeking to escape the dilemma, did not then represent the plaintiff.

The judgment against Meridian Construction Company may stand, as it has dismissed its appeal. Since the evidence has been very fully developed, the judgment against Mary Louise Hilton and Frances M. Bell is reversed, with directions to enter a judgment for them; the judgment establishing a lien on the real estate is reversed. A new judgment will be entered in accordance with this opinion.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.