Carl **NICHOLS** and Donna Nichols,
Plaintiffs/Respondents,

v.

The **PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
Defendant/Appellant.

No. 61124.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 9, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 13, 1993.

Application to Transfer Denied
May 25, 1993.

Stephen L. Beimdiek, Lisa Stump, Lashly & Baer, St. Louis, for defendant/appellant.

James P. Krupp, St. Louis, for plaintiffs/respondents.

CRANE, Judge.

Defendant, the Prudential Insurance Company of America, appeals from a judgment on a jury verdict in the amount of $19,175 in favor of plaintiffs, Donna and Carl Nichols, for breach of an oral contract to waive premiums after six months on a converted whole life insurance policy. Prudential asserts the trial court erred in overruling its motion for judgment notwithstanding the verdict and alternative motions for new trial and remittitur and in entering judgment on the verdict. Prudential argues that there was no substantial evidence that its local agents had actual or apparent authority to make the oral contract alleged to have been breached. We reverse.

## FACTUAL BACKGROUND

A motion for judgment notwithstanding the verdict presents a trial court with the issue of whether the plaintiff made a submissible case. *Dockery v. Mannisi*, 636 S.W.2d 372, 376 (Mo.App.1982). In reviewing the trial court's ruling on this motion, we view the evidence and all reasonable

inferences which may be drawn therefrom in the light most favorable to the plaintiffs and we disregard all contrary evidence and inferences. *Id.*

In 1982, Donna Nichols executed an insurance contract with Prudential Insurance Company of America (Prudential) through Prudential sales agent William McDonald. The policy was a thirty-four year term life policy with an initial benefit of $40,000 which, after three years, decreased annually over the remaining term. The policy contained two supplementary benefits as riders. The "Insured's Waiver of Premium" rider provided that if Donna Nichols became disabled during the term of the contract, premiums which fell due while Donna Nichols was totally disabled would be waived. The rider for "Term Insurance Benefit on Life of Insured Spouse—Decreasing Amount" provided life insurance on Carl Nichols for a twenty-year term in the initial amount of $30,000, which decreased annually over the twenty-year term. This rider did not contain a waiver of premium benefit if the insured spouse became disabled.

Both the policy insuring Donna Nichols and the rider insuring Carl Nichols could be converted to other insurance plans under conditions specified in the policy and rider. The policy allowed Donna Nichols to convert her term insurance to whole life insurance and, if she had become disabled while covered by the term insurance before the conversion, premiums would be also waived for that disability under the converted policy. However, the conversion provisions on the spousal term rider provided: "We will not waive any premium under a new contract unless the disability started on or after its contract date."

Carl Nichols was the primary insured under other life insurance policies with Prudential. He became totally disabled in 1983, approximately one year after the 1982 policy was executed. At that time his premiums were waived on those Prudential policies on which he was the primary insured.

In June, 1988, Gary Brasher, a sales manager for Prudential who had taken over McDonald's former sales territory, set up an appointment with Carl and Donna Nichols to discuss converting the term life policy insuring Donna Nichols and the rider insuring Carl Nichols into separate whole life insurance policies for each spouse. Under the conversion the amount of insurance that each spouse had left on the term policy and the term rider would be converted to whole life insurance policies.

Brasher met with Donna and Carl Nichols on June 10, 1988. They discussed converting the rider into a whole life policy for Carl Nichols. Donna Nichols told Brasher that she could not afford to pay the additional premiums on a whole life policy. Brasher told them that if the new whole life policy had a rider for waiver of the premium benefit in case of disability, Carl Nichols would pay premiums only during a six-month waiting period. After six months, payment of premiums would be waived because of his disability. Brasher testified that he thought the waiver of premiums provision might be available because Prudential had waived premiums on Carl Nichols' other Prudential policies after he became disabled.

Donna Nichols testified that she insisted that Brasher check with the home office to make sure the premium payments would be waived after six months. Brasher testified he told Carl and Donna Nichols that he thought the premiums could be waived but he did not want to do the conversion until he spoke to the home office. While Brasher was at their home, Carl and Donna Nichols signed an application for a conversion of the rider to a whole life policy on Carl Nichols in the amount of $19,000.

Brasher testified that within a week or two after the June meeting, he called Prudential's home office and spoke to a term conversion technician who told him that payment of premiums could be waived for a permanent disability after six months of payments. Approximately two weeks later Brasher delivered a copy of the converted whole life insurance policy to Carl Nichols. During that visit, Brasher told them that he had checked with the home office and

had been told that the premiums on Carl would be waived after six months.

Carl Nichols then called McDonald, the Prudential sales agent who wrote the original 1982 term life policy, and told him that he had converted the policy and the premiums were going to be waived. McDonald disagreed with the conclusion that the policy would allow a waiver. In September, 1988 McDonald and Brian Wahe, district manager for Prudential, met with Carl and Donna Nichols to discuss converting Donna Nichols' 1982 term life policy to a whole life policy on her life. They also gave both spouses the option of participating in the "Gold Conversion Campaign" a temporary Prudential promotion which allowed term policies to be converted to an amount 25% higher than their present conversion amount. Both spouses elected to take that option. Carl Nichols signed an application to increase the face amount of his new policy to $23,750 under this campaign. "WP to be included in this policy" was written in on the application form. "WP" stood for waiver of premium benefit.

During the September meeting Donna Nichols questioned the agents about whether the premium on Carl Nichols' policy would be waived. She testified that they told her "they had checked and there seemed to be no problem." Carl Nichols testified that Wahe said, "there shouldn't be no problem of waiver of premium." McDonald testified that he told them that the premium would not be waived because Carl Nichols' insurance was on a rider, and the waiver of premium provision in that policy applied only to Donna Nichols. Carl Nichols' premium was being waived only on those policies on which he was the primary insured. Wahe testified that he disagreed and told them he could not see any reason why the waiver of premiums would not go into effect, but that he would research the situation and get back to them. Wahe later talked to Brasher who told Wahe "that he had communicated with the home office that the waiver of premium was going to be included in that." Carl Nichols knew that Wahe and Brasher had higher positions at Prudential than McDonald.

Wahe advised Donna and Carl Nichols that he would be going to the person in processing "and attempting to get . . . the claim and the settlement for the waiver of premium." On October 26, 1988, Wahe wrote Carl Nichols advising him that his request for a 25% increase on the policy had been approved. Wahe told Nichols he was still awaiting the attending physician's statement which was necessary to process the disability claim. He further advised Nichols that after the statement was received, Prudential would begin consideration of his claim of disability. After Wahe received the physician's statement, he completed the claim form for the waiver of premiums and sent it to Prudential's home office for approval.

In November 1988, Wahe learned that Prudential was going to deny the waiver of premiums on Carl Nichols' new policy. Wahe and Brasher went to the Nichols' home to deliver Carl Nichols' new policy. They informed Donna and Carl Nichols that Prudential had refused to approve a waiver of premiums but they recommended that he keep the policy and pay the premiums because they believed he would not otherwise be able to obtain further insurance because of his disability. Carl Nichols became upset. Wahe and Brasher left the new policy with him. The policy had a face value of $23,750 and contained a rider for "Insured's Waiver of Premium Benefit." This rider provided that Prudential would waive contract premiums that fell due while the insured was totally disabled subject to certain conditions, including: "The Insured must become disabled while this contract is in force. . . ." The policy had an effective contract date of June 13, 1988, and granted the insured a right to cancel ten days after receipt.

After being informed in November that Prudential would not waive premiums on Carl's policy, Carl and Donna Nichols did not make any further premium payments on that policy. By that time, Carl and Donna Nichols had made five premium payments on Carl Nichols' whole life policy totalling $177.45.

On December 29, 1988, Prudential sent a letter to Carl Nichols stating that Prudential would not waive premiums for Carl Nichols on the converted whole life policy because 1) the claimed disability occurred in 1983, before the beginning date of the converted policy, and 2) the original 1982 term life policy did not provide a premium waiver provision for Carl, as the insured spouse.

## PROCEDURAL HISTORY

On May 10, 1989 Carl and Donna Nichols [hereinafter collectively referred to as plaintiffs] filed a petition against Prudential seeking damages for breach of contract. They subsequently filed a three count second amended petition against Prudential and Brasher, alleging breach of contract against Prudential in Count I, fraud against Prudential in Count II, and fraud against Brasher in Count III. The case was tried on the second amended petition. Prior to the submission of the case to the jury, plaintiffs dismissed Brasher and Counts II and III without prejudice. The case was submitted to the jury on Count I, the contract claim against Prudential. In this count plaintiffs alleged that they entered into an agreement with Prudential whereby they agreed to pay premiums for six months to Prudential and Prudential agreed to provide life insurance policy D89 145 778 on Carl Nichols in the face amount of $23,750 and to waive premiums after six months. The jury returned a verdict in favor of plaintiffs assessing damages in the amount of $19,175. The trial court entered judgment on this verdict and denied Prudential's post-trial motions.

## ACTUAL AND APPARENT AUTHORITY

Plaintiffs base their claim of a contract on the oral statements made by Brasher and Wahe that premiums on the converted whole life policy would be waived after six months. Plaintiffs contend that Brasher and Wahe agreed to waive premiums while they were acting within their actual or apparent authority as Prudential agents. Prudential asserts that there was no substantial evidence that these agents had actual or apparent authority to enter into an oral insurance contract, contrary to the terms of the written contract,[1] that the premiums would be waived.

Plaintiffs had the burden at trial of proving that Prudential's agents had actual or apparent authority to bind Prudential to an agreement to waive premiums. *Gibson v. Metropolitan Life Ins. Co.*, 204 S.W.2d 439, 444 (Mo.App.1947). We find that plaintiffs failed to make a submissible case on the agents' authority.

As a principal Prudential is responsible for the acts and agreements of its agents which are within their actual or apparent authority. *Dickinson v. Bankers Life & Casualty Co.*, 283 S.W.2d 658, 662 (Mo.App.1955). "Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency § 7 (1957). Actual authority may be express or implied. Express authority is created when the principal explicitly tells the agent what to do. *Barton v. Snellson*, 735 S.W.2d 160, 162 (Mo.App.1987). Implied authority consists of those powers incidental and necessary to carry out the express authority. *Id.*

On the other hand, apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that another has the authority to act for the principal. *Id.* A finding of apparent authority requires evidence that a principal has communicated directly with the third party or has knowingly permitted its agent to exercise authority. *Lampkin v. Kelly*, 771 S.W.2d 953, 955 (Mo.App.1989). Thus actual authority is created by the principal's man-

---

1. The written contract of insurance between Prudential and Carl Nichols did not provide for the waiver of premiums if he had become disabled prior to the date that contract became effective. Further, the rider under which Carl Nichols had been insured under Donna Nichols' policy did not allow conversion to a whole life policy which would allow waiver of premiums for a disability which began while the rider was in force.

ifestations to the agent, whereas apparent authority is created by the principal's manifestations to a third party.

### Actual Authority

■ We first address the question of Brasher and Wahe's *actual* authority to bind Prudential. Brasher testified that he was a sales manager for Prudential. In this capacity he oversaw ten sales agents and assisted them on sales calls and service work. He reported to the district manager and could directly telephone various departments in the home office. He did not have the authority to determine what provision of a policy would be effective.

Wahe testified he was a Prudential district manager. In this capacity he managed and supervised a staff of representatives, a service staff, and five sales managers "to service Prudential Insurance products" in an area that included northern St. Louis City and County. He could bind insurance coverage until the home office made final approval, but testified a policy did not become permanently binding until home office approval was obtained. He had no authority to grant final approval or to change or vary the terms of any of the policies sold by any of the agents under him. He represented himself to the public as a district manager. His business card had his name, the title "manager" and the name "Prudential."

No evidence was adduced that either Brasher or Wahe could issue or execute policies of insurance. Rather the uncontroverted evidence established that this was a power reserved to the home office. Likewise, plaintiffs adduced evidence that neither Brasher nor Wahe had authority to decide whether premiums would be waived on a policy and that this decision could only be made by the home office.

Furthermore, the documentary evidence offered into evidence by plaintiffs contained specific limitations on the agents' authority. The application form that Donna Nichols filled out for the original 1982 policy contained the following language: "No agent can make or change a contract, or waive any of Prudential's rights or

needs." Both applications for Carl Nichols' 1988 conversion policies recited, "a copy of the original application ... may be attached to, and made a part of, any new contract(s) resulting from this Application for Change." The copy of the 1988 policy included in the briefs as Exhibit A–2 has a copy of the 1982 application attached to it. Additionally, both the 1982 and the 1988 insurance contracts provided: "*Contract Modifications.*—Only a Prudential officer may agree to modify this contract, and then only in writing."

■ The trial evidence thus established that Wahe and Brasher were "soliciting agents." Soliciting agents for insurers are those who procure applications, forward them to officers who issue the policies, collect premiums and deliver the policies, and bind coverage while the insurer determines whether to accept or reject the coverage. *See State ex rel. MFA Mutual Ins. Co. v. Rooney*, 406 S.W.2d 1, 2–4 (Mo. banc 1966). A soliciting agent who is merely authorized to solicit insurance, take applications, deliver policies, and collect premiums does not have power to make oral contracts of insurance, *Neuner v. Gove*, 133 S.W.2d 689, 693 (Mo.App.1939); *Hawes v. American Central Ins. Co.*, 222 Mo.App. 1057, 7 S.W.2d 479, 482 (1928), or enter into other contracts of insurance, issue policies, modify or change the contract as embodied in the policy, or to waive the terms and conditions thereof. *Bennett v. Royal Union Mut. Life Ins. Co.*, 232 Mo. App. 1027, 112 S.W.2d 134, 145 (1938). A soliciting life insurance agent ordinarily has no power to modify the terms and conditions under which a policy will be issued or become effective. 16 Appleman, Insurance Law and Practice § 8699, at 290 (1981).

On the other hand, a "general agent" is an insurance agent who has actual authority to sign, countersign and issue policies, accept risks, agree upon and settle the terms of insurance contracts, modify the terms of existing policies, issue new policies or renew old policies containing exclusionary clauses or make modifying endorsements on existing or new policies.

*Rooney,* 406 S.W.2d at 4; *American Family Mutual Insurance Company v. Bach,* 471 S.W.2d 474, 478 (Mo.1971). There was no evidence that Wahe or Brasher had this express authority. In fact, the uncontroverted evidence was that they did not. It follows that without such express authority they could not have implied authority to carry out any of the above functions.

Plaintiffs argue that Wahe's testimony that he could "bind" coverage constitutes express or implied authority to bind Prudential to an agreement to waive premiums. This argument misconstrues the use of the word "bind" in an insurance context. Wahe's testimony on this issue was as follows:

Q. What powers and authorities do you have with respect to binding?

A. We can bind coverage and that would be actually putting the protection in for us until such time as the home office makes final approval. Only when the contract is issued and therefore permanently binding.

Q. And every instance in which an insurance policy is sold by an agent at Prudential out of your office, is it necessary to get home office approval before that policy becomes effective or binding?

A. Absolutely.

Q. Do you have any authority in your position as district manager to ever grant that approval or make that binding determination?

A. No, sir.

Q. Do you have any authority within your position of district manager of the home office to change or vary the terms of any of the insurance policies that are sold by any of your agents?

A. No, sir.

The above testimony indicates that Wahe had the power to "bind" only in the technical sense of entering into a temporary or conditional contract pending an insurer's decision to accept the risk and issue a policy or reject the risk.[2] He affirmatively testified that he had no power to bind the company in the general sense of ap-

proving or modifying policies. The authority to bind does not make a life insurance agent a general agent with the power to create a contract of insurance. Appleman, § 7242; *Rooney,* 406 S.W.2d at 2–4. At most the authority to issue binders gives the agent apparent authority to make statements about binders he is authorized to deliver. Appleman, § 7242; *Chailland v. M.F.A. Mutual Insurance Company,* 375 S.W.2d 78, 82–83 (Mo. banc 1964).

Plaintiffs next argue that the advice of the term conversion technician to Brasher "that he could convert the term" constituted "an express grant of actual authority to convert the rider on Policy Number 38–729–621 to the contract now in dispute, Policy Number D89 145 778." Because the term rider was in fact converted to the written policy referred to, we assume plaintiffs are referring to the alleged oral contract in dispute. This argument is not supported by the evidence. Brasher's testimony on this issue is as follows:

(Direct Examination)

Q. (By plaintiffs' attorney) So you called and ask in the Nichols case for a specific technician, not a specific one but for—

A. A technician.

Q. A technician. What's a technician?

A. Technician usually is in a supervisory capacity so, you know again, I didn't want to talk to just an underwriter because I possibly might have a new underwriter that was being trained in it.

Q. So you are talking to supervisor?

A. I talked to a supervisor which is a technician.

Q. That would have been when, what month of '88?

A. Let's see, it would have been in June of '88 when I was out there.

Q. So right about the time this policy was written. We talking about the waiver of premiums, Carl's rider policy, you talked to the term conversion technician supervisor, right?

**2.** *See* 12A Appleman, Insurance Law and Practice §§ 7227 and 7237 (1981) for a discussion of "binders" in non-personal and personal insurance situations.

A. Right.

Q. And what did that supervisor tell you?

A. She have told me that I could convert the term, the rider off of the wife's policy providing I went through the six month period, what we call the waiting period and he continued to pay the premiums and then we would go ahead and waive the premiums and, you know, we will pay him for the rest of his life if he was going to be disabled for the rest of his life.

Q. That's what the supervisor at Prudential told you?

A. Exactly.

Q. In June of 1988?

A. Yes, sir.

Q. Okay. And you relied on that?

A. Yes, sir.

Q. And you then conveyed that to the Nichols at their home, correct?

A. Yes, sir.

Q. And so did they ask you to convey that and explain it to them?

A. Yes.

Q. And you explained it to them?

A. Exactly the way the technician had repeated it to me.

\*   \*   \*   \*   \*   \*

(Cross Examination)

Q. (By defense counsel) And you did then talk to somebody at the home office?

A. Yes, sir.

Q. And they told you that they thought that the waiver of premium would be—

A. If we went ahead and paid the premium for the six months, then the waiver of premium would take over and pay for the policy.

There is no evidence of what information, if any, Brasher gave the unidentified technician about the policy under which the plaintiffs were covered or about Carl Nichols' disability. There is no evidence that the technician knew or was advised that Carl Nichols was already disabled. The evidence shows only that an agent testified that a technician gave him an interpretation of an unspecified factual situation. There is no evidence of the technician's authority or that the technician expressly told Brasher he could enter into a contract to waive premiums in contravention of policy provisions.

We conclude there was no substantial evidence of actual authority, express or implied, from Prudential to its sales manager or district manager to enter into an oral contract to waive premiums.

*Apparent Authority*

We next examine the words and conduct of Prudential to the plaintiffs to determine if Prudential caused them to reasonably believe its agents had apparent authority to waive premiums. Plaintiffs claim that Prudential conferred apparent authority on Brasher through his title of "sales manager" and "through the fact that Mr. Brasher communicated with several divisions of [Prudential's] home office in Jacksonville, Florida on a daily basis."

■ A principal may create the appearance of authority by making representations to third persons establishing the agent's apparent authority or knowingly permitting the agent to act in a way that created the impression with third persons that the agent had apparent authority. Restatement (Second) of Agency § 27 (1957). However we find neither of the acts referred to by plaintiffs constitute the creation of such authority.

■ The designation of an insurance agent as a "manager," standing alone, does not constitute evidence that Prudential was holding Brasher out as a "general agent." *Neuner,* 133 S.W.2d at 693; *Punton v. United States Life Ins. Co.,* 213 Mo.App. 49, 245 S.W. 1080, 1082 (1922). If a principal puts an agent into a position in which, according to the ordinary habits of persons in the profession, it is usual for such an agent to have a particular kind of authority, anyone dealing with that agent is justified in inferring he has such authority in the absence of reason to know otherwise. Restatement (Second) of Agency § 49 comment c (1957). There was no evidence that it was the usual custom in the insurance industry for a "sales manager" to have the authority of a "general agent." A soliciting agent may have apparent authority, by virtue of his position, to make agreements

and representations in connection with acts within his express authority, such as the taking of an application of insurance, but he has no apparent authority to bind the insurer by acts which relate to the contract of insurance. *Mitchell v. Metropolitan Life Ins. Co.*, 116 S.W.2d 186, 188 (Mo.App. 1938). In particular a soliciting agent does not have apparent authority by virtue of his or her position to agree that a life insurance policy would continue in effect without the full payment of the premium. *Id.*

Plaintiffs also claim apparent authority based on Brasher's ability to communicate with the Jacksonville office on a daily basis. Brasher testified that he could call the home office in Jacksonville and speak to the underwriting department, "the change provision," the term conversion department, and the new business department. There was no evidence about the content of these daily communications. Additionally there was no evidence to show that Prudential allowed its soliciting agents to enter into or modify insurance contracts on the basis of any communications with the home office divisions in Jacksonville, Florida. Moreover, there was no evidence that plaintiffs knew that Brasher made such calls on a daily basis and relied on this knowledge. Under these circumstances, Brasher's testimony that he could and did call the home office on a daily basis was not evidence of apparent authority to waive premiums on insurance contracts.

Plaintiffs argue that they were entitled to and did rely on Wahe's and Brasher's representations as to their authority and assurances that the premiums would be waived.[3] This argument overlooks the fact that to establish apparent authority, the evidence must show that the *principal* created the appearance of authority. *Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 13 (Mo.1970). Apparent authority arises from acts of the alleged principal, and not

**3.** The jury was erroneously instructed that it could find apparent authority on the basis of the agents' conduct and the plaintiffs' reasonable reliance on the agents' conduct. The jury was erroneously *not* required to find either that Prudential's conduct caused plaintiffs to believe the agents had authority to perform the acts on its

from acts of the agent. *Id.* Proof of an agent's authority cannot be made solely by proof of the agent's own statements. *Dickinson v. Bankers Life & Casualty*, 283 S.W.2d 658, 662 (Mo.App.1955).

CONCLUSION

Plaintiffs wholly failed to adduce substantial evidence that Prudential engaged in any acts which gave Wahe and Brasher actual or apparent authority to enter into an oral contract to waive premiums on a policy issued by Prudential under circumstances prohibited by that policy. Absent such evidence, they failed to make a submissible case on breach of an oral contract of insurance. The trial court accordingly erred in overruling Prudential's motion for judgment notwithstanding the verdict.

The judgment of the circuit court is reversed.

CARL R. GAERTNER, P.J., and CRAHAN, J., concur.

behalf or that Prudential knew and allowed the agents to engage in conduct that would cause a third person to believe they had authority, which MAI 13.07(1) and (2), defining apparent authority, require. This appeal does not, however, involve instructional error, but error in submissibility.