**UNITED MISSOURI BANK, N.A., Appellant,**

v.

**Clyde M. BEARD, H. Irene Beard, Judy Carol Cunningham, Timothy Dean Walkenhorst, and JoAnn Frances Walkenhorst, Respondents.**

No. WD 47996.

Missouri Court of Appeals, Western District.

June 7, 1994.

**238**

Leonard L. Wagner and Greg T. Spies, Kansas City, for appellant.

Thomas Sullivan, Kansas City, for respondents.

Before BERREY, P.J., and KENNEDY and ELLIS, JJ.

ELLIS, Judge.

This is a suit on a promissory note and for foreclosure of a deed of trust securing the note. United Missouri Bank, N.A. ("UMB") filed its petition on September 20, 1991. The case was tried to the court on November 9, 1992, and the matter was taken under advisement. On May 13, 1993, the trial court entered judgment in favor of the defendants, and UMB appeals. We affirm.

In the summer of 1977, Timothy and JoAnn Walkenhorst purchased certain Jackson County residential real estate from Paul Gimmarro, a home builder and real estate developer. The financing was arranged through W.L. Brady Investments, Inc. ("Brady Investments"), and on July 26, 1977, the Walkenhorsts executed a promissory note and deed of trust in favor of Brady Investments. The face amount of the note was $35,500.00, payable in monthly installments of $285.62, which included interest of 9% *per annum,* with the first payment due on September 1, 1977 and the final payment due on August 1, 2007. The note also gave the Walkenhorsts a prepayment privilege. The deed of trust described the real estate and pledged it as security for payment of the note. On July 27, 1977, the deed of trust was filed and recorded in Jackson County.

The very next day, July 28, 1977, W.L. Brady (Brady Investments' president and founder) executed an assignment of the deed of trust to UMB. Brady Investments' vice president Geraldine Brady then endorsed the Walkenhorst note, and both documents were delivered to UMB as collateral for a loan from UMB to Brady Investments. Neither UMB nor Brady Investments informed the Walkenhorsts of the assignment, which was not recorded until April 2, 1991.

Brady Investments collected regular monthly payments on the Walkenhorst note from September, 1977 until September, 1989, when the Walkenhorsts contacted Paul Gimmarro's father Carl Gimmarro, another home

builder and real estate broker, about selling their home. The Walkenhorsts eventually agreed to convey the property to Gimmarro as part of the consideration for his building their new residence. Gimmarro, in turn, agreed to sell the property to Clyde and Irene Beard and their daughter Judy Cunningham ("the Beards"). Both transactions were closed through Ticor Title Insurance Company ("Ticor Title").

The closing took place on October 2, 1989. A few days earlier, Ticor Title had requested and received from Brady Investments a loan payoff letter showing the remaining balance on the Walkenhorst note. At closing, the Beards delivered cash for the purchase price to Ticor Title, and two days later, on October 4, 1989, Ticor Title forwarded to Brady Investments by mail a check in the amount of $30,719.38, the amount shown in the payoff letter. In the same letter, Ticor Title also requested that Brady Investments send a deed of release for recording "as soon as possible." Neither the note nor the deed of release were returned as requested. In fact, after the check was sent, Ticor Title never heard from Brady Investments again. Moreover, although the check was endorsed for deposit and paid on or about October 10, 1989, Brady Investments never forwarded any of the proceeds to UMB to satisfy the Walkenhorst note held as collateral on the Brady note.[1]

On September 20, 1991, UMB filed its Petition for Judicial Foreclosure of Deed of Trust seeking judgment for $17,000.00 (the unpaid balance on the Brady note), plus accrued interest and attorney fees, and for an order foreclosing the deed of trust. The Walkenhorsts' answer alleged, *inter alia*, that payment in full was made (through Ticor Title) to Brady Investments, who collected said payment as UMB's agent. The case

was tried without a jury on November 9, 1992. On May 13, 1993, the trial court entered judgment in favor of the Walkenhorsts and the Beards on the basis that the Walkenhorsts made final payment to Brady Investments as UMB's agent, issuing findings of fact and conclusions of law in support of its decision.[2] This appeal followed.

Our standard of review in this court-tried case is set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Accordingly, the judgment entered by the trial court will be affirmed on appeal unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32.

### The Burden of Proof

A party sued on a note has the burden of establishing the affirmative defense of payment by a preponderance of the evidence. *Madison v. Dodson*, 412 S.W.2d 552, 556 (Mo.App.1967); *Household Fin. Co. v. Watson*, 522 S.W.2d 111, 114 & n. 1 (Mo. App.1975). If the maker of a promissory note who has made payments thereon to someone other than the note's rightful owner demonstrates that the one to whom the payments were made was the owner's agent with authority to collect the payments, the affirmative defense of payment is established and the maker is entitled to the benefit of all such payments. *Tedesco v. Bekker*, 741 S.W.2d 896, 898 (Mo.App.1987).

This case therefore turns on the existence and scope of an agency relationship between UMB and Brady Investments. The Walkenhorsts had the burden of proving that Brady Investments was UMB's agent with authority to collect the $30,719.38 prepayment on the note,[3] because a party alleging

---

**1.** Brady Investments is no more. W.L. Brady died some years ago, Geraldine Brady has apparently pleaded guilty to unrelated federal fraud charges, and the firm is now bankrupt. As the Walkenhorsts' attorney put it during trial: "[T]he Brady Investment Company is long gone."

**2.** Neither party requested findings of fact and conclusions of law. However, voluntarily given findings and conclusions " 'do form a proper basis for assigning error and should be reviewed.' " *In Interest of L.W.F.*, 818 S.W.2d 727,

733 (Mo.App.1991) (quoting *Graves v. Stewart*, 642 S.W.2d 649, 651 (Mo. banc 1982)). The preceding factual summary tracks the findings of fact made by the trial court.

**3.** UMB does not dispute that Brady Investments was authorized to collect the regular monthly payments on the Walkenhorst note as UMB's agent.

agency has the burden of proof regarding both the fact of the agency and the scope of the agent's authority. *Houston v. Groth Enterprises, Inc.,* 670 S.W.2d 178, 180 (Mo.App. 1984).

### Apparent Authority

In its first point, UMB argues the trial court erroneously applied the law of agency in holding that prepayment of the principal balance on the Walkenhorst note to Brady Investments constituted payment to UMB and discharged the debt. UMB directs our attention to the trial court's conclusions of law, from which it is clear the trial court's rationale was that Brady Investments had apparent authority to collect prepayment on the note as UMB's agent.

■ "Apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that another has the authority to act for the principal." *Barton v. Snellson,* 735 S.W.2d 160, 162 (Mo.App.1987). Put another way, it is authority which the principal, by his acts or representations, has led third persons to believe has been conferred upon the agent. *Hyken v. Travelers Ins. Co.,* 678 S.W.2d 454, 457 (Mo. App.1984).

■ Accordingly, apparent authority does not arise if the third person does not act in the belief that the agent possesses authority to act on the principal's behalf. *Hamilton Hauling, Inc. v. GAF Corp.,* 719 S.W.2d 841, 846 (Mo.App.1986). This rule is explicitly stated in an official comment to § 8 of the *Restatement (Second) of Agency:*

> [A]pparent authority exists only with regard to those who believe and have reason to believe that there is authority; *there can be no apparent authority created by an undisclosed principal.*

*Restatement (Second) of Agency* § 8 comment a (1958) (emphasis added).

Missouri courts have followed the Restatement on this point. Comment a to § 8 of the *Restatement (Second) of Agency* was quoted with approval in *Jeff–Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5 (Mo.1970), in which the Missouri Supreme Court held that a party who, in entering into a contract with the general contractor on a construction project, "considered no agency relationship and looked to *no one* as a principal of" the general contractor, could not later seek to hold the owner of the real estate upon which the project was being built liable on the contract by asserting that the general contractor had apparent authority to act on behalf of the owner. *Id.* at 13–14 (emphasis in original). As the Court explained:

> One who deals with a person as *principal* cannot later set up that person's apparent authority to act for another so as to hold the latter person liable as principal, when he did not previously rely upon any such authority . . . . . [O]ne cannot escape the fact that the plaintiff did not *rely* upon any claimed agency of [the general contractor] for the actual owners, and it cannot now reverse its position.

*Id.* at 13, 14 (emphasis in original). In the instant case, the evidence clearly established UMB was an undisclosed principal as to the Walkenhorsts since they did not know UMB held the note and deed of trust or had any interest in their property whatsoever until well after they had prepaid the principal balance (through Ticor Title) to Brady Investments. Moreover, Betty Frerking, the closing agent at Ticor Title who handled the sale for both the Walkenhorsts and the Beards, said she, too, was unaware that UMB had become the holder of the note.

It thus cannot be said the Walkenhorsts prepaid the principal balance on the note in reliance on the apparent authority of Brady Investments as UMB's agent. They made the $30,719.38 prepayment to Brady Investments on the assumption that the note and deed of trust were in fact still held by Brady, the original owner. They cannot reverse their position and hold UMB liable as principal now, when they did not previously rely upon the existence of any apparent agency relationship. *Jeff–Cole Quarries,* 454 S.W.2d at 14.

The Walkenhorsts also contend that certain representations made by Geraldine Brady created apparent authority for Brady Investments to collect prepayments on the note. In 1982 or 1983, Mr. Walkenhorst called Geraldine Brady and asked if she

would show him some houses in the Blue Springs area. According to Walkenhorst, during the course of this conversation, Ms. Brady told him "she still held our note" and it was "costing her money" to do so because the prevailing interest rate was higher than the 9% rate fixed in the note.[4] Walkenhorst also testified that Ms. Brady said nothing "about having sold the note or transferred the note." In 1988, Mr. Walkenhorst again spoke with Geraldine Brady, this time about building a new home with the proceeds of a "construction loan and another note" arranged by Brady Investments. During their telephone conversation and subsequent face-to-face meeting, Walkenhorst said, Ms. Brady never mentioned that their first note had been assigned to UMB.

█ The Walkenhorsts claim this conduct established Brady Investments' apparent authority to collect prepayments on behalf of UMB. We disagree. Because apparent authority arises from the acts of the alleged *principal*, not the acts of the *agent*, *Wilson v. St. Louis Area Council, Boy Scouts*, 845 S.W.2d 568, 571 (Mo.App.1992), apparent authority cannot be based upon an ostensible agent's unauthorized claims of authority. *Inland USA, Inc. v. Reed Stenhouse, Inc.*, 660 S.W.2d 727, 733 (Mo.App.1983); *Houston*, 670 S.W.2d at 180. "All of the texts and decided cases recognize that apparent authority must arise from acts of the alleged principal, and *not* from any acts of the agent; an agent cannot create his own authority." *Jeff–Cole Quarries*, 454 S.W.2d at 13 (emphasis in original). As the Walkenhorsts failed to show UMB permitted, acquiesced in, or even knew of Geraldine Brady's misrepresentation to the Walkenhorsts concerning ownership of the note, no apparent authority was created thereby. They therefore failed to meet their burden of proof on the issue of apparent authority.

For these reasons, the trial court was incorrect in concluding that UMB was not entitled to relief because Brady Investments had apparent authority to collect prepayment on the Walkenhorst note on behalf of UMB. However, since our primary concern on appeal of a court-tried case "is the correctness of the result, not the route taken to reach it," *Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus*, 824 S.W.2d 92, 94 (Mo.App. 1992), and because we will affirm the trial court's judgment, if correct, on any reasonable legal theory supported by the evidence, *Safeco Ins. Co. v. Stone & Sons, Inc.*, 822 S.W.2d 565, 567 (Mo.App.1992), we must also evaluate the alternative theories of recovery urged by the Walkenhorsts to determine if the trial court's ruling was correct under some other reasonable legal theory supported by the evidence.

### Actual Authority

█ The Walkenhorsts raise three such theories, but it is only necessary for us to discuss one: that Brady Investments had actual authority to collect the balance of the Walkenhorst note prior to maturity. Actual authority is different from apparent authority in that while apparent authority is created by the principal's manifestations to a third party, actual authority is created by a principal's manifestations to his *agent*. *Nichols v. Prudential Ins. Co.*, 851 S.W.2d 657, 661–62 (Mo.App.1993). "Actual authority may be express or implied. Express authority is created when the principal explicitly tells the agent what to do. Implied authority consists of those powers incidental and necessary to carry out the express authority." *Id.* at 661 (internal citation omitted). The Walkenhorsts claim Brady Investments had both express and implied actual authority to collect prepayments as UMB's agent.

### Express Actual Authority

█ The only person who testified about the existence and scope of the express actual authority given Brady Investments by UMB regarding the Walkenhorst note was Robert Harr, a senior vice president in charge of UMB's real estate loan department who had managed UMB's loans to Brady Investments since June, 1984. According to Harr, Brady Investments was authorized to collect the Walkenhorsts' regular monthly principal and

---

4. This was, of course, untrue. In late 1977, some five or six years earlier, Geraldine Brady

had herself endorsed the Walkenhorst note "without recourse" and delivered it to UMB.

interest payments on the note as UMB's agent.

The Walkenhorsts insist Brady Investments had express actual authority to collect prepayment by virtue of the fact their note contained a prepayment privilege, relying on *Tedesco v. Bekker,* 741 S.W.2d 896 (Mo.App. 1987). This reliance is misplaced. In *Tedesco,* the court held there was express actual authority for the agent to collect the prepayment where the note in question permitted prepayment of the unpaid balance without the consent of the lender and a written management agreement between the principal and the agent appointed the agent as the principal's "exclusive agent to manage" the loan and further instructed the agent to "use all reasonable efforts to collect all funds due under the terms" of the note and deed of trust. *Tedesco,* 741 S.W.2d at 897, 899. The court concluded that the authority given the agent in the management agreement to "collect all funds due," coupled with the fact that the note provided for prepayment of the unpaid balance, constituted express actual authority to collect prepayment. *Id.* at 899.

The Walkenhorst note, like the note in *Tedesco,* does contain a prepayment provision. However, there was no evidence of any written management agreement between UMB and Brady Investments that Brady was to collect "all funds due" under the note. There was only Harr's testimony that Brady was authorized to accept regular monthly payments on the note. Because the court in *Tedesco* relied on the conjunction of the written agreement and the prepayment provision, the case is inapposite.

*Implied Actual Authority*

■ The Walkenhorsts also contend the trial court's judgment can be sustained on a theory of implied actual authority. They argue that since their note contained a provision allowing them to "prepay the principal amount outstanding in whole or in part" at any time without the holder's consent, Brady Investments' express actual authority to collect the monthly principal and interest payments on the Walkenhorst note carried with it, by implication, the authority to collect the balance of the note at any time prior to maturity. We agree.

When a note contains a prepayment privilege, an agent's authority to make collections on the note for his principal includes not only the authority "to receive payment of the note when same was matured," but also the implied authority "to receive payments which the payors, under the terms of the instrument, had the right to make before the note matured." *Hicks v. Hugo,* 68 S.W.2d 160, 162 (Tex.Civ.App.1934); *accord Frost v. Fisher,* 13 Colo.App. 322, 58 P. 872 (1899) (when note contains prepayment option, agent authorized to collect note is presumptively acting within the scope of his authority in accepting prepayment from maker exercising the option). "Receiving money at any time when by contract it was payable was surely not in excess of the agent's power." *Frost,* 58 P. at 879.

UMB cites *Hamilton v. Hecht,* 283 S.W.2d 894 (Mo.App.1955), and *Hochrein v. Balthasar,* 361 S.W.2d 315 (Mo.App.1962), for the proposition that an agent's authority to make collections on a note for his principal will not be extended by implication to justify collection of money before it is due, *even if the note contains a prepayment privilege.* The holding in *Hamilton* does not support that proposition and, in fact, is actually in accord with the rule stated in *Hicks* and *Frost.* On the other hand, *Hochrein* is factually dissimilar to the case at bar.

In *Hamilton,* the prepayments received by the agent from the debtor were made in violation of the terms of the note, which allowed prepayment only on certain dates and in sums not less than $100. 283 S.W.2d at 900. The court observed that under such circumstances, the agent's receipt of the nonconforming prepayments should not be considered impliedly authorized by the principal:

> To hold otherwise would be to give the agent power to alter the terms of the contract, and that the agent should not be allowed to do under constructive authority. Such authority should carry with it power to collect only at the time nominated in the instrument.

*Id.* (quoting *O'Connell v. Reuter,* 237 Mo. App. 883, 891, 178 S.W.2d 464, 469 (1944)).

The court then concluded that in the absence of knowledge, acquiescence or consent on the part of the principal to the agent's practice of accepting nonconforming prepayments, the agent's authority to receive payment on the notes at the time designated in those instruments did not carry with it by implication the power to collect the amounts of those notes before they were due. 283 S.W.2d at 900. It is therefore clear the court in *Hamilton* simply applied the rule, stated by this court in *Bennett v. Royal Union Mut. Life Ins. Co.,* 232 Mo.App. 1027, 1040, 112 S.W.2d 134, 143 (1938) that "[n]o authority will be implied to receive payments which do not, in the time or manner in which they are made, conform to the terms of the contract creating the obligation to pay."

UMB also calls our attention to this statement in *Hamilton:*

An agent's authority to make collections for his principal will not be extended by implication so as to justify the collection by him of money before it is due, particularly a considerable time before the obligation matures....

*Hamilton,* 283 S.W.2d at 899. The court gave several rationales for this rule, which is essentially the vestige of a prior time. They are that collection of principal before it comes due involves loss of interest on the holder's investment, exposes the holder to a risk of payment at a time he had not anticipated, and deprives the holder, since he knows the maturity date, of the opportunity of keeping track of the activities of his agent. *Id.* at 900 (citing 1 Floyd R. Mechem, *A Treatise on the Law of Agency* § 958 (2d ed. 1914)).

■ We readily concede that in earlier times, when lenders rarely if ever permitted prepayment and borrowers were obligated to pay principal and interest over the life of the loan at the time and place specified by the lender, these reasons may well have justified the rule. However, at the present time, when investments change on a daily basis depending on changes in interest rates or the stock market, and there is instant access to investment information as well as the ability to make electronic transfers of funds and investments, there is simply no basis for applying the rule in a case such as the one at bar, where the note expressly authorized full or partial prepayment at any time without consent of the holder. Where such a provision exists, there can be no reasonable expectation on the part of the holder that the note will not be paid prior to maturity, and therefore there can be no unanticipated loss of interest on the investment. Likewise, it cannot reasonably be contended that the holder is exposed to a risk of payment at a time he had not bargained for, because by permitting prepayment without consent, the holder has bargained for payment at any time. Finally, the principal always has the ability, indeed the duty, to check on the doings of his agent without regard to whether the note the agent is to collect contains a prepayment clause. The existence of such a clause in no way deprives the principal of the opportunity and responsibility to keep track of such matters.

In *Bennett, supra,* this court stated:

[A]uthority to receive payment of an obligation does not authorize an agent to receive it before it is due. This rule is not an absolute or arbitrary one. **An agent is allowed to collect in advance in cases and under circumstances where the reason of the rule ... does not operate ... and under such circumstances that the terms of his principal's contract are not altered or affected....**

*Bennett,* 232 Mo.App. at 1040–41, 112 S.W.2d at 143–44 (emphasis added). As noted above, the reason for the rule simply does not operate on the facts of this case. We therefore decline to follow it. Here, the Walkenhorsts' prepayment to Brady Investments fully complied with the terms of the note, which, as observed *supra,* permitted them to "prepay the principal amount outstanding in whole or in part" at any time without the holder's consent. Brady Investments was therefore impliedly authorized to accept the prepayment on behalf of UMB.

UMB also cites *Hochrein v. Balthasar,* 361 S.W.2d 315 (Mo.App.1962), in support of its argument that Brady Investments had no implied actual authority to accept prepayments on its behalf. It is true that in *Hochrein,* the court held the evidence was insufficient to "establish the implied authority of

Sander [the agent] or his company to collect prepayments on account of principal." *Id.* at 323.

However, *Hochrein* is clearly distinguishable. In *Hochrein*, the deed of trust gave the Hochreins the privilege to make prepayments of principal in the amount of "$100 or any multiple thereof ... on any [regular] payment date, provided that thirty days advance notice in writing was given the trustee." *Id.* at 316. While each of the four prepayments made by the Hochreins were in multiples of $100, the opinion shows they were made from two to twelve days before the corresponding scheduled regular payment dates. *Id.* at 316–17. Moreover, the opinion gives no indication the Hochreins gave the required advance written notice before making the prepayments. Because the prepayments were made in violation of the terms of the deed of trust, under *Hamilton* and *Bennett*, there was no implied actual authority for Sander to receive them.

But there is yet another important factor distinguishing *Hochrein*. In that case, the principal herself, Mrs. Balthasar, "stated on both direct and cross-examination that she had never authorized [Sander] to accept or collect prepayments of principal for her, and that she had [actually] forbidden him to do so." *Id.* at 318. She also testified that Sander had told her "to let the principal run as long as it could run, because she would get more interest," and that she might have to wait for prepayments anyway since the Hochreins had a son overseas and probably wouldn't attempt to pay off the loan until he returned. *Id.* Finally, Balthasar testified that Sander had lied to her when she asked him if he had received a prepayment with the first regular installment payment from the Hochreins. *Id.* In reaching its decision, the court stressed that Balthasar "had expressly forbidden Sander" to collect prepayments of principal, and pointed out that "her testimony remains uncontradicted." *Id.* at 321.

Attempting to draw a parallel, UMB contends that Brady Investments had no implied actual authority to collect prepayment on the Walkenhorst note because Brady had, from the outset, been forbidden to accept prepayment on UMB's behalf. In support of this contention, UMB points to the testimony of Robert Harr, who indicated that, during his handling of the account, Brady Investments was unauthorized to receive "anything other than those regular monthly installments due on the terms of [the] note." In particular, UMB stresses Harr's testimony that to the best of his knowledge, UMB never "authorize[d] W.L. Brady Investments to collect full payment or prepayment of the balance on behalf of the bank."

As can be readily seen, this testimony falls far short of that found dispositive in *Hochrein*. Furthermore, Harr, who began managing the Brady loan in June, 1984, admitted on cross-examination that he had no personal knowledge regarding any restrictions purportedly placed on Brady Investments' authority at the time of the assignment in 1977. This is amply demonstrated by the following excerpts from the transcript:

Q. Did you have any specific time or place or occasion at which you made this agreement as to what W.L. Brady may collect?

A. W.L. Brady acted on instructions before I was even employed with the bank.

Q. And those are the instructions that you refer to about W.L. Brady's authority?

A. Yes.

Q. Did W.L. Brady of—you were not party to those instructions yourself?

A. No, I was not.

\* \* \* \* \* \*

Q. You told us earlier that W.L. Brady Investments had the authority to collect and receive [only] the monthly payments?

A. Yes, I did.

Q. But do you know of any specific authority or directions that they were given to do that?

A. Again, that arrangement that W.L. Brady Investments, Inc. had with the bank was prior to my joining the bank.

If there is any uncertainty arising either from a conflict in the evidence or because the undisputed facts might lead reasonable men to draw different conclusions as to the scope of the authority of the agent, the question is for the finder of fact to determine. *Philp v.*

*Minnesota Mut. Life Ins. Co.,* 657 S.W.2d 679, 682 (Mo.App.1983). Here, the trial court clearly resolved the factual issue of whether UMB had forbidden Brady Investments to accept prepayment on the Walkenhorst note against UMB. In its findings and conclusions, the trial court characterized Harr's testimony describing the alleged limitation on Brady Investments' authority to collect prepayment as "undocumented," saying that it "must be compared with 12 years of activity suggesting that no such limitation existed." It concluded that Brady Investments "was the agent of plaintiff for the purpose of collecting all amounts payable under the terms of the Walkenhorst note, both monthly installments as well as prepayment of principal." We therefore reject UMB's claim, based on Harr's testimony, that Brady Investments had no implied actual authority to collect prepayment on the Walkenhorst note.

### Equitable Considerations

 Finally, UMB argues at some length that the proximate cause of the loss in this case was Ticor Title's negligence in not demanding the note and a deed of release or otherwise ascertaining who held the note *before* disbursing the payoff funds to Brady Investments, who then absconded with those funds. UMB also urges that under the equitable doctrine that "where one of two innocent parties must suffer, the loss must fall upon the one whose negligence caused the loss," *Kraemer v. Leber,* 267 S.W.2d 333, 338 (Mo.App.1954), as between UMB, the Walkenhorsts, and the Beards, the Walkenhorsts should bear the loss in this case due to the neglect of their closing agent, Ticor Title.

We disagree. When, as here, payment is made to an authorized agent, "[t]he default of such agent is the responsibility of the principal. It is the principal who in the first instance selects the agent, grants him the authority and enables him to come into possession of the funds which are diverted. It is this conduct which makes the loss possible and the principal may not shift the burden to the party dealing with his agent." *Rockford Life Ins. Co. v. Rios,* 128 Ill.App.2d 190, 261 N.E.2d 530, 533 (1970); *see also Holsclaw v. Catalina Sav. & Loan Ass'n,* 13 Ariz.App.

362, 476 P.2d 883, 888 (1970) (arguments relating to the debtor's negligence "are without effect when an actual agency by implication is established" by the evidence at trial).

### Conclusion

Brady Investments had implied actual authority from UMB to collect the balance of the Walkenhorst note prior to maturity. Consequently, the trial court did not err in entering judgment in favor of respondents.

The judgment of the trial court is affirmed.

All concur.